1  MARK L. WEBB, ESQ. (BAR NO. 067959)
   LAW OFFICES OF MARK L. WEBB
2  214 Grant Street, Suite 301
   San Francisco, CA 94108
3  Telephone: (415) 621-4500
   Facsimile: (415) 621-4173
4

5  Attorneys for Plaintiff
   DONALD WALKER
6

7              IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                       SAN FRANCISCO

10  DONALD WALKER,                      Case No. C 07-2857 SC

11        Plaintiff,                    **DECLARATION OF MARK L.
                                        WEBB, ESQUIRE IN SUPPORT
12  v.                                  OF PLAINTIFF'S OPPOSITION
                                        TO DEFENDANT PACIFIC
13  PACIFIC PRIDE,                      PRIDE'S MOTION FOR
                                        SUMMARY JUDGMENT OR
14        Defendant.                    PARTIAL SUMMARY
                                        JUDGMENT**
15

16

17

18

19  I, MARK L. WEBB, ESQUIRE, declare:

20      1.   I am an attorney at law and a member in good standing before the Courts of the State

21  of California and of the Bar of the United States District Court for the Northern District of

22  California.

23      2.   I am the attorney of record for the Plaintiff, Donald Walker, in this matter, and was so

24  since its inception in state court (*Walker v. Pacific Pride*, No. CGC 06-456176, Superior Court of

25  California, County of San Francisco), before being removed to this Court.

26

27

1       3.   Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the Operations

2 Manual of Pacific Pride, which I personally used in the course of taking deposition testimony in

3 this and the state court proceeding without any objection by Pacific Pride as to its authenticity or

4 validity.

5       4.   Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the

6 deposition testimony of Armstrong Lum, dated March 20, 2007.

7       5.   Attached hereto as Exhibit 3  is a true and correct copy of excerpts from the

8 deposition testimony of David Harris, dated April 23, 2007.

9       6.   Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the Offering

10 Circular of Pacific Pride, which I personally obtained from the Internet and used in the course of

11 taking deposition testimony in this and the state court proceeding without any objection by Pacific

12 Pride as to its authenticity or validity.

13       7.   Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the Franchise

14 Agreement of Pacific Pride, which I personally obtained from the Internet and used in the course of

15 taking deposition testimony in this and the state court proceeding without any objection by Pacific

16 Pride as to its authenticity or validity.

17       8.   Attached hereto as Exhibit 6 is a true and correct copy of the Declaration of Leon

18 Gottlieb, plaintiff's expert witness.

19       9.   Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the deposition

20 testimony of Robert Falche, dated February 15, 2007.

21       10.   Attached hereto as Exhibit 8 is a true and correct copy of the Declaration of Gary

22 Buffington, plaintiff's expert witness.

23       11.   Attached hereto as Exhibit 9 is a true and correct copy of excerpts from the Website

24 Advertisements of Pacific Pride, which I personally obtained from the Internet and used in the

25 course of taking deposition testimony in this and the state court proceeding without any objection

26

27

28

1  by Pacific Pride as to its authenticity or validity.

2       I declare under penalty of perjury under the laws of the State of California that all of the

3  foregoing its true and correct except as to those matters which are stated upon information and

4  belief, and as to those matters I believe them to be true

5       October 10, 2007, San Francisco, California,

6

7

8                                          MARK L. WEBB, ESQUIRE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INDEX OF EXHIBITS TO DECLARATION OF MARK L. WEBB

1    Excerpts from Pacific Pride's Operations Manual

2    Excerpts from Deposition of Armstrong Lum

3    Excerpts from Deposition of David Harris

4    Excerpts from Pacific Pride's Offering Circular

5    Excerpts from Pacific Pride's Franchise Agreement

6    Declaration of Leon Gottlieb

7    Excerpts from Deposition of Robert Falche

8    Declaration of Gary Buffington

9    Excerpts from Pacific Pride Website Advertisement

**EXHIBIT 1**

THIS MANUAL HAS BEEN PREPARED FOR THE EXCLUSIVE USE OF PACIFIC PRIDE FRANCHISEES AND THEIR EMPLOYEES. IT IS A VIOLATION OF THE PACIFIC PRIDE FRANCHISE AGREEMENT AND COPYRIGHT LAW TO COPY, IN ANY MANNER, THE CONTENTS OF THIS MANUAL OR TO DIVULGE THE CONTENTS TO ANYONE WHO IS NOT A PACIFIC PRIDE FRANCHISEE OR EMPLOYEE THEREOF. DO NOT COPY THIS MANUAL OR ANY PART OF IT WITHOUT THE EXPRESS WRITTEN PERMISSION OF PACIFIC PRIDE SERVICES.

COPYRIGHT© By **Pacific Pride Services, Inc.,** 2001. All rights reserved. No part of this publication may be reproduced, transmitted, transcribed, stored in a retrieval system, or translated into any language, in any form, by any means, without the written permission of Pacific Pride Services, Inc.

# CHAPTER 9 - MAINTENANCE, RECONCILIATION & INSPECTIONS

Section 1: Site Maintenance .................................................................................................
Section 2: Fuel Spills ............................................................................................... 9-1
Section 3: Card Reader Maintenance ...................................................................... 9-1
Section 4: Volume and Checks ................................................................................ 9-2
Section 5: Annual Inspection Report ....................................................................... 9-4
Section 6: Incident Report Procedures ................................................................... 9-4
                                                                                               9-4

## EXHIBITS
9A.      Pacific Pride Annual Inspection Report ......................................................... 9A-1
9B.      Incident Report Procedures .......................................................................... 9B-1

## Section 1: Site Maintenance

Your Pacific Pride sites must be maintained to ensure that the sites are safe, clean, and well lit. The equipment must be in proper working order at all times. The Pacific Pride Commercial Fueling System is known for providing sites to the commercial customer that are efficient, clean, and safe at all hours of the day or night. Pacific Pride's success depends on every site in the system being up to standard in all areas. Your customers, as well as other marketers' customers, will show their appreciation for a clean, well-kept site by returning again and again to fuel. Each Pacific Pride site must be self-inspected every year to ensure that sites are in compliance with the Pacific Pride standards. The "Pacific Pride Annual Inspection Report" (Exhibit 9A) is an effective tool for measuring the location's appearance and operation. You are encouraged to review your site periodically throughout the year to ensure your site is the best it can be. A reporting procedure for people with comments about sites has been established, and we encourage you to use the "Incident Report" form (see Exhibit 9B) to report these comments from your customers. The "Pacific Pride Annual Inspection Report" and "Incident Report Form" are discussed in Sections 5 and 6 of this chapter.

## Section 2: Fuel Spills

   **a.**      Now is the time to inspect your locations to make sure your sites do not have contaminated areas caused by accumulated spills.

   **b.**      We suggest the following guidelines concerning spills and their prevention:

   1. Instruct customers in proper use of equipment.
   2. Clean all spills as soon as possible using an approved method.
   3. Clean diesel stains from islands and island pad.
   4. Implement an ongoing nozzle test and replacement program to ensure properly operating nozzles.
   5. Redesign, if necessary, site storm drain system to ensure spills do not enter the city storm sewer system.


Condon
EXHIBIT NO: 2
2/6/07
SCHMITT & LEHMANN, INC.

6.   Satellite fueling:
   (a)   If your sites are equipped with satellite-type fueling, a combination of customer training and signs requiring the nozzle to be manned may help.
   (b)   Install an oil/water separator to capture a spill before it contaminates the environment.
   (c)   Install pressure-activated nozzles.

7.   Develop a spill contingency plan including training of your personnel and maintaining an industry-approved cleanup material on hand.

8.   Design all future sites to allow maximum protection from spills.
   (a)   Install an oil/water separator or at least design the island pads to allow the future installation of separators.
   (b)   Protect site storm drains.

## Section 3: Card Reader Maintenance

The Petro Vend and SmartLock™ systems were designed to be as maintenance free as possible. The procedure described below should be performed at specified intervals to ensure trouble-free operation.

a.   **Battery.** The battery installed in the Fuel Site Controller is a 10-year shelf-life battery with the capability of 5,000 hours of backup power. This battery powers the memory that retains all information such as pump parameters, card validation, and pump status. **Check the battery** periodically by calling the system and doing a "show system." A battery test will automatically be performed and a status displayed.

b.   **Card Readers.** Clean and wax the outdoor card reader station often to prevent rust and to extend the life of the unit's finish.

If you are not considering installing a canopy, we recommend you purchase a card reader weather cover. The covers are an inexpensive way to provide some protection from the weather for your customers and card reader. These card reader covers are available from a variety of sources.

Cleaning the optical card reader Lexan plates should be done at least every two to four weeks, or more often for high-volume or dusty sites.

1.   The vast majority of optical card reader errors are not attributable to hardware/card defects, but rather to soiled card reader Lexan plates.

2.   Petro Vend has "Kard Reader Kleaners" in their product line. These can be ordered from your Petro Vend equipment supplier (Part No. 020-4401). We suggest that you supply these cleaners to your site supervisor to be used as part of their regular maintenance program. Instructions for use are printed on each card. This activity should be

**EXHIBIT 2**

1           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2              IN AND FOR THE COUNTY OF SAN FRANCISCO
3                  UNLIMITED CIVIL JURISDICTION
4                           --o0o--
5

6    DONALD WALKER, an individual,        )
                                          )
7                    Plaintiff,           )
                                          )
8        vs.                              )    No. CGC 06-456176
                                          )
9    PACIFIC PRIDE, a business entity,    )
     form unknown, RICHARD K. POOLER,     )
10   an individual, DOES 1 through 50,    )
     inclusive,                           )
11                                        )    ORIGINAL
                                          )
                     Defendants.          )
12   _____)
13
14
15                        Deposition of
16                       ARMSTRONG LUM
17                      March 20, 2007
18
19

20   Reported by:
21   James Matthews, CSR 7916
22
23                       TOOKER & ANTZ
              COURT REPORTING & VIDEO SERVICES
24             350 SANSOME STREET, SUITE 700
              SAN FRANCISCO, CALIFORNIA 94104
25                    (415) 392-0650

1    Q.    How is this one different?

2    A.    This one is different because this does not require

3    the model number, model name.

4    Q.    Let's go to the next page, please.  And this one

5    has to do with checking of the Kalmar forklift, and I don't

6    want to ask you why you issued a citation, but can you tell

7    me what you saw?

8    A.    What I saw was a forklift that had a damaged guard

9    to its lights.

10    Q.    And you have pictures of that too?

11    A.    Correct.

12    Q.    Okay.  And I get it.  Okay.  Let's go to the next

13    page.

14         Item 7.  And again, I'm just going to ask you in

15    connection with this which says that no set of -- or a set of

16    operating rules was not posted.  Would you please tell me

17    what you saw?

18    A.    It's what I didn't see is why there was a

19    violation.

20    Q.    Okay.  Tell me if you could what you didn't see.

21    A.    I didn't see a set of operating rules for a

22    forklift.

23    Q.    Okay.  Were they -- and I'm asking you not now in

24    the context of why you cited this, because I'm not permitted

25    to do that in this deposition at least now, but is there a

28

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1    place that they're supposed to be cited?  Or I'm sorry, is

2    there a place that they're supposed to be posted?

3            MR. GROSSGART:  That calls for expert

4    testimony.  Don't answer.

5            MR. WEBB:  Q. where did you look for these -- where

6    did you look for these operating rules to be posted?

7        A.    At the work place.

8        Q.    Any place in the work place?  I mean, did you look

9    all over?

10       A.    I did not look all over.

11       Q.    Okay.  Can you tell me where you did look?

12       A.    I looked at where they post other posting

13   requirement.  In their bulletin board.

14       Q.    Inside the office?

15       A.    It was inside the office.  Correct.

16       Q.    Okay.  Now, if you remember, did you take pictures

17   of that?

18       A.    No.

19       Q.    Okay.  So this is from your memory, then.  Looked

20   inside the office, and there's a bulletin board I think

21   you're saying, right?

22       A.    Correct.

23       Q.    Do you remember what was on that bulletin board?

24       A.    No.

25       Q.    Okay.  But you did look on the bulletin board to

29

1    see if there were operating rules on the forklift, right?

2        A.    That's correct.

3        Q.    And there were none, right?

4        A.    Correct.

5        Q.    Is that the only place you looked at the bulletin

6    board inside the office, or did you look other places?

7        A.    I asked the employer if it could have been posted

8    any other place in the job site.

9        Q.    Okay.  And the employer said what?

10       A.    I don't remember exactly what he said.  But the

11   resulting comment was that there would have been no other

12   place he would have posted it.

13       Q.    And when you say the employer, the only one I know

14   of that was interviewed by you that would constitute the

15   employer was a man named Robert Falche.  Is that who you

16   spoke to, or was it somebody else?  I could be wrong.

17       A.    One person was Rob Martin, sales marketing

18   manager.  Second person was Barry Viles, sales manager.

19       Q.    V-i-l-e-s?

20       A.    Correct.

21       Q.    Okay.  Now, are those the only two people that you

22   spoke to that you're considering the employer in the context

23   of what we're talking about that you saw?

24       A.    That's correct.

25       Q.    All right.  Do you remember which one of those two

30

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1  told you that this is the only -- that there's no other place

2  that these rules would be?

3      A.   Both.

4      Q.   And when you were there that day did they accompany

5  you around for any period of time or did they just sort of

6  let you do your thing?

7      A.   I was accompanied by them.

8      Q.   At all times?

9      A.   Most of the time.

10     Q.   How long would you say that this process took that

11 you were looking around and being accompanied?

12     A.   I believe I went there twice.

13     Q.   Okay.

14     A.   I was there on September 22nd, 2005.

15     Q.   Yes, sir.

16     A.   And on October 14th, 2005.

17     Q.   Okay.  Is there any way for you to identify -- and

18 I know the record should reflect that you're refreshing your

19 memory with your notes, which is perfectly fine, which of

20 those two dates were the dates that you looked for the

21 operating rules for the forklift?

22     A.   On the first day I looked for them.  And asked for

23 them.  And on the second visit I asked Barry also if he has a

24 set of operating rules.

25     Q.   And what happened?  What happened on the second

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1   date?  Did he tell you that he had them?

2       A.   He did not have them.

3       Q.   So would it be fair to say that you asked about

4   them on September 22nd and found that there were none, and

5   that on October 14th you asked a second time and there were

6   none?

7       A.   Correct.

8       Q.   Okay.  And that's Barry Viles both times, or was it

9   Rod the first time and Barry the second, or do you remember?

10      A.   Rod the first time, Barry the second time.

11      Q.   Okay.  Was Barry with you the first time that you

12  talked to Rod about this?

13      A.   No.

14      Q.   So Rod was alone?

15      A.   Correct.

16      Q.   Did you have any conversation with Rod Martin to

17  inform him that there should be such rules posted?

18      A.   Yes.

19      Q.   What did you tell him?

20      A.   I asked him if he has a set.  He says no, and I

21  said you should have a copy.  As a result he's going to get a

22  violation.

23      Q.   And did you tell him that he should have them

24  posted?

25      A.   Yes.

32

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1   What was your approach?

2       A.   I don't remember how I asked him.  But basically

3   that is what I wanted to find out.  Whether or not he was

4   certified.

5       Q.   And did you ask him that?

6       A.   Yes.

7       Q.   And did he say no?

8       A.   He said no.

9       Q.   Okay.  He didn't -- did he say what does that mean

10  to be certified?  Did he ask you anything like that?

11      A.   I don't remember.

12      Q.   Okay.  Bottom line is that your memory is he said

13  I'm not certified.  Words to that effect.  Right?

14      A.   Correct.

15      Q.   Okay.  Let's go to the next page which is item 9.

16  Having to do with a refresher training.  And is that also

17  from the conversation with Mr. Rios?

18      A.   Yes.

19      Q.   Okay.  And in that conversation of 15 minutes in

20  September did you ask Mr. Rios if he had been provided a

21  refresher training course after the accident?

22      A.   That's correct.

23      Q.   And then he said no?

24      A.   He did not have one.

25      Q.   Okay.  To your understanding what is a refresher

37

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1    learned from speaking to people there that -- how am I going

2    do this, Counsel?

3            MR. GROSSGART:  That led you to believe that they

4    hadn't implemented?

5            MR. WEBB:  Well, yeah, that's fine.

6            MR. GROSSGART:  Procedures to investigate the

7    incident?

8            MR. WEBB:  Q. Do you understand what's being asked

9    of you?

10       A.    Can you ask that again?

11       Q.    Maybe the two of us together could.  Okay, what is

12   it that you heard or saw from the people at the work site

13   that led you to the conclusion that no corrective measures or

14   inadequate -- or whatever this says -- that there was no

15   procedure implemented to investigate the incident?  I'm just

16   paraphrasing what you wrote.  You wrote this, right?

17       A.    Correct.

18       Q.    Okay.  So what is it that you learned or heard or

19   saw that led you to this?

20       A.    I asked the employer to send me a copy of their

21   accident investigation report.

22       Q.    Okay.

23       A.    And the employer did.  And upon review the accident

24   report does not indicate any corrective actions.

25       Q.    Okay.  Was that in September or October that you

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1      Q.   Okay.  And do you know if any corrective measures

2   were ultimately included in a follow-up report?

3      A.   The employer had appealed the citations.

4      Q.   Um-hum.

5      A.   And meanwhile I have not done a follow-up.

6      Q.   No.  But what I'm saying -- thank you.  I think

7   that probably answered it.  But -- when you told him in --

8   did you say September?  That there needed to be corrective

9   measures in the report?  Or was that October?  You said

10  Barry, right?

11     A.   Barry would have been in October.

12     Q.   Okay.  So when you said that to him did you ask him

13  that he -- strike that.

14          Did you tell him that he needed to do that when

15  they did an investigation on an accident of this nature?

16     A.   Well, an investigation was conducted.  It's just

17  that they have to indicate what the corrective actions --

18     Q.   Right.  And I'm asking you did you tell him that in

19  October, that he needed to include corrective measures in

20  such an investigation?  Did you tell him that?  Or did you

21  just issue the citation in November?

22     A.   I would have told him, yes.

23     Q.   Oh, okay.  And to the best of your knowledge have

24  any corrective measures been included in any follow-up

25  incidents, investigations by the employer, to the best of

42

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES (415-392-0650)

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1      A.    It's in the loading rack area.

2      Q.    Okay.  Good.  Now we're done.  How tough was that?

3            Okay.  The rest of this particular document which

4      is the rest of this exhibit, and then we'll take a break,

5      says that the dumpster, he was carrying the dumpster on its

6      forks towards the loading rack area, which partially

7      obstructed the operator's view, and the load was not

8      trailing.  And I'm just asking you what's the source of your

9      information that the dumpster was partially obstructing the

10     operator's view?

11     A.    The dumpster was raised in front of him, and --

12           MR. LEMMON:  Objection, nonresponsive.  He asked

13     you how you came to that information, not how it was located.

14     You can go ahead and answer the question.

15           MR. WEBB:  Q.  I know, with three lawyers telling

16     you what to do, it's tough.  Go ahead.  You can finish.

17           Better yet, could you read back his answer?

18           (Record read.)

19           MR. WEBB:  Q.  Okay.  You want the question again?

20     A.    Yes, please.

21     Q.    Okay.  So here's the question.  What is the source

22     of your understanding that his view of the forklift operator

23     was partially obstructed?

24     A.    The source is from the operator himself.

25     Q.    Okay.  So what words did he use, Mr. Rios, I

51

DEPOSITION OF ARMSTRONG LUM - 3/20/2007

1    assume, right?

2        A.    Correct.

3        Q.    To tell you that?

4        A.    I don't remember the exact words.

5        Q.    Is there anything in your reports that would be a

6    quote or a paraphrase of what he said about that?

7        A.    I remember him telling me that the dumpster was in

8    front of him and he was traveling forwards.

9        Q.    Okay.  But did he tell you that his view was

10   obstructed, or was this a conclusion of yours, or a

11   combination of both, or what?

12       A.    That would be a combination of both.

13       Q.    At any point that you recall did he tell you that

14   he couldn't see because of the dumpster being in front of

15   him?  Or that he couldn't see completely because of the

16   dumpster in front of him?  Did he say those words to you?

17       A.    I don't remember him saying that.

18       Q.    What did he say to you, if anything, about his

19   ability to see?  With the dumpster in front of him?

20       A.    He said he was traveling forwards with the dumpster

21   raised.  But then I get to my opinion.

22       Q.    I just want to know what he said, Mr. Lum.

23             MR. GROSSGART:  Just listen to the question and

24   answer what he's asking you exactly.

25             THE WITNESS:  I don't remember what he said.

**EXHIBIT 3**

ORIGINAL

1

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF SAN FRANCISCO

3    UNLIMITED CIVIL JURISDICTION

4                                    ⓒ COPY

5    DONALD WALKER, an individual,        )
                                          )
6                    Plaintiff,           )
                                          )
7    vs.                                  ) Case No. CGC 06-456176
                                          )
8                                         )
     PACIFIC PRIDE, a business entity,    )
9    form unknown, RICHARD K. POOLER,     )
     an individual, and DOES 1 through    )
10   50, inclusive,                       )
                                          )
11                   Defendants.          )
     ─────────────────────────────────── )

12

13

14

15

16

17             DEPOSITION OF DAVID HARRIS

18           Taken in behalf of the Plaintiff

19

20

21                   Salem, Oregon

22                   April 23, 2007

23

24   REPORTED BY:
     LAURIE A. VOLKER
25   OREGON CSR NO. 05-0394

11

1    petroleum business?

2         A    In 1967.

3         Q    And so you would have been about?

4         A    Sixteen.

5         Q    Yeah.  What did you do?

6         A    Started out as a service station attendant.

7         Q    Okay.  And then what?  Can you just sort of give me

8    a brief chronological --

9         A    Yeah.  I have really done virtually everything in

10    the petroleum-distribution business.  I have been a service

11    station attendant; an assistant service station manager at a

12    retail service station; a station manager; a truck driver;

13    an operator of a heating oil distribution business; I was a

14    furnace repairman; I was a retail representative, a

15    wholesale representative; a convenience store operator and

16    vice president of the company, president of the company;

17    operated a company that had about a hundred and ten retail

18    service stations; and operated sixty Pacific Pride locations

19    as a franchisee of Pacific Pride.

20         Q    Okay.  And are you still operating as a franchisee?

21         A    No.

22         Q    Okay.  When did you stop doing that?

23         A    I sold my business in February of 2003.

24         Q    And what was the name of that business, sir?

25         A    Truax Harris Energy.

15

1     A    Probably 1984 or 1985.

2     Q    Okay.  At that time did they tell you what their

3  goals were?

4     A    No.  I mean, they were operating a small business

5  and trying to grow it.

6     Q    Okay.  And obviously it has grown considerably;

7  right?

8     A    Yes.

9     Q    Now there's fourteen, fifteen hundred sites?

10     A    There is about fourteen hundred that accept Pacific

11  Pride cards.

12     Q    Just was at the Red Lion over here and saw one

13  across the street.  There's one right on the Highway I-5; is

14  that right?

15     A    There's a number of them on I-5.

16     Q    How many?

17     A    I don't know.

18     Q    Are you the president of the company?

19     A    Yes.

20     Q    Okay.  How many are in Oregon, if you know,

21  approximately?  I don't want to know exactly.

22     A    I'm going to say seventy or eighty.

23     Q    Okay.  Now, in the beginning when you had these

24  four sites, and they were approved -- I know at the

25  beginning they weren't exactly franchises to begin with, but

19

1    to reject a site if they choose.  You understand that;

2    right?

3              MR. HART:  Well, if you're referring to something

4    within the agreement and you're questioning the witness, why

5    don't you put it in front of him.  That will probably

6    facilitate things quite a bit.

7              MR. WEBB:  Well, if he tells me that he doesn't

8    know that it's in the agreement, then I will.

9         Q    BY MR. WEBB:  Do you know it's in the agreement

10   that Pacific Pride has the discretion to reject a site?

11             MR. HART:  Object to the form of the question.

12             THE WITNESS:  Well, I think what's in the agreement

13   is they have the right to accept a site.

14        Q    BY MR. WEBB:  Okay.  And you know that's in the

15   agreement; right?

16             MR. HART:  Object to the form of the question.

17             THE WITNESS:  I know that Pacific Pride has the

18   right to accept a site.

19        Q    BY MR. WEBB:  Okay.  And they have a right to

20   reject a site; right?  I mean, the opposite of accepting is

21   rejecting; right?

22             MR. HART:  Object to the form of the question.

23             THE WITNESS:  I guess so.

24        Q    BY MR. WEBB:  I mean, you're the president; right?

25        A    I am the president, that's correct.

25

1    have to go there, did they?

2        A    I don't know what you mean when you say, "they

3    didn't have to go there."

4        Q    Well, if the reason for exclusion of a franchise

5    site is they had the same ZIP code as another franchise

6    site, then that would be the reason to reject it, it sounds

7    like to me.

8        MR. HART:  Well, your question to him was has he

9    ever declined any.  It has nothing to do with your question

10   about whether inspections occurred.

11       Q    BY MR. WEBB:  Okay.  So I'm just asking.  If it's a

12   ZIP code problem -- were all the rejections because of the

13   ZIP code issue or exclusivity issue?

14       A    No.

15       Q    Okay.  What other reasons have there been to

16   reject?

17       A    Because a site may not meet our requirement in

18   terms of available products.

19       Q    For instance, what kinds of available products?

20       A    You need to have at least one grade of diesel, at

21   least one grade of gasoline, and at least one other grade of

22   petroleum product.

23       Q    Are those requirements strictly enforced?

24       A    Yes.

25       Q    Okay.  Is the requirement that the station be open

1    twenty-four hours a day, seven days a week, strictly

2    enforced?

3         A    Yes.

4         Q    What happens when you find out that that's not

5    being done in a specific instance generally?

6         A    When what's not being done?

7         Q    It's not open 24/7.

8         A    We contact the franchisee and advise them or ask

9    them if the site's open twenty-four hours a day.  I can't

10   recall that circumstance ever arising, but...

11        Q    But you could if you -- if it did arise, contact

12   them; right?

13        A    That's right.

14        Q    And then have a conversation with them?

15        A    (No audible response.)

16        Q    "Yes"?

17        A    Yes.

18        Q    Okay.  And you just don't remember having that

19   happen while you were the president; right?

20        A    That's correct.

21        Q    Okay.  So let's go back to your history.  So you

22   started by, I guess, pumping gas at a gas station at the age

23   of sixteen, yes?

24        A    That's correct.

25        Q    Okay.  And then you became the manager of a service

28

1    A    Not that I'm aware of.

2    Q    This is the only one that you know of?

3    A    Yes.

4    Q    Okay.  So if you could, I just want to know, when

5    you drove truck and delivered fuel, if you could tell me,

6    sir, what was the means by which you would unload fuel

7    generally?

8    A    Through a hose.

9    Q    Okay.  And can you be more specific?  How did that

10   work?

11   A    I would drive up to a house or a business and stop

12   the truck and go insert the hose into the receptacle of the

13   tank, and turn on the flow of the product, and fill the

14   tank.

15   Q    Okay.  And about how long did you do that work?

16   A    Oh, about two years.

17   Q    And in those two years, I assume you had occasion

18   to notice that sometimes the fuel spills; right?

19   A    Yes.

20   Q    Is that something that's not uncommon, let's say?

21   A    It happens.

22   Q    Okay.  I'm not going to ask you because you were a

23   kid back then, but did it happen every time that you

24   delivered fuel?

25   A    No.

1              MR. HART:  Okay.

2       Q    BY MR. WEBB:  Mr. Harris, you're aware that in --

3  there's an operations manual that's required reading for a

4  franchise?

5       A    Yes.

6       Q    And does this look familiar to you as being a

7  chapter from the operations manual?

8       A    Yes.

9       Q    Okay.  And this chapter is called, "Maintenance,

10  Reconciliation and Inspections."  You see that?

11      A    I see that.

12      Q    And you see section one says, "Site Maintenance"?

13      A    Yes.

14      Q    And the first page says -- and by the way, the

15  operations manual is mandatory reading for the franchisees,

16  isn't it?

17      A    Yes.

18      Q    Okay.  Now, since you go back almost to the

19  beginning, or to the beginning, how long has the operations

20  manual been something that was mandatory reading for a

21  franchise owner?

22      A    I have no idea.

23      Q    Okay.  When you had sixty franchises, was there an

24  operations manual?

25      A    At some point in time Pacific Pride started putting

1    law.

2        Q    BY MR. WEBB:   Okay.   And would there be any

3    enforcement provisions that you know?

4        A    Oh, there's enforcement provisions, but I'm not

5    intimately familiar with them.

6        Q    Okay.   Fair enough.   So now, what got me off on

7    that tangent was to ask you if you know that the UFOCs or

8    the UFOC requires an operations manual to be in effect for a

9    franchise?

10       A    I don't know.

11       Q    Okay.   All right.   So let's look at this operations

12   manual.   This is the Pacific Pride -- a section of the

13   Pacific Pride operations manual.   It's chapter nine.   We're

14   talking about it.   Under section one where it says, "Site

15   maintenance," you see that?

16       A    I see that.

17       Q    Okay.   It says, "Your Pacific Pride sites must be

18   maintained to ensure that the sites are safe, clean, and

19   well lit"; okay?   You can see that; right?

20       A    I can.

21       Q    Okay.   Is it a requirement of Pacific Pride that

22   the franchise sites should be maintained so that they're

23   safe, clean and well lit?

24       A    Yes.

25       Q    Okay.   And how do you enforce that provision?

36

1    self-inspections is to ensure that the trademarks and

2    signage is correct.

3        Q    So are you telling me that there's no concern at

4    all as to whether it's safe?

5        A    No.  We would encourage our franchisees to have

6    safe facilities.

7        Q    Well, in fact you require it, according to this

8    operations manual; right?

9        A    That's correct.

10       Q    Okay.  So what I'm asking you is how do you force

11   that requirement other than self-inspections?

12       A    That's it.  Self-inspections.

13       Q    Has anybody -- I'm sorry.  I didn't mean to

14   interrupt you.  Did you finish?

15       A    Yeah.

16       Q    Has anybody failed a self-inspection because the

17   site was not safe?

18            MR. HART:  Object to the form of the question.

19   Asked and answered.

20            THE WITNESS:  Not to my knowledge.

21       Q    BY MR. WEBB:  Okay.  I think what's best, Mr.

22   Harris, is if you let your attorney finish his objection,

23   and that way it will make it a lot easier on her.  She's

24   trying to take everything down, and it's hard to do when two

25   people are talking.

42

1    A    No.

2    Q    Have you known of any franchise that was terminated

3 because it did not display proper signage?

4    A    Not specifically.

5    Q    Okay.  And then the next sentence, or the sentence

6 right after that in that same document, Exhibit 2, says,

7 "The Pacific Pride Commercial Fueling System," and it's all

8 in caps.  Is that a part of the logo, so to speak, that's

9 all in caps?

10    A    The Pacific Pride Commercial Fueling System?

11    Q    Yes, sir.

12    A    That is contained within our logo.

13    Q    Okay.  That's part of your advertisement or part of

14 your trade name?

15    A    Part of our name.

16    Q    Okay.  "The Pacific Pride Commercial Fueling System

17 is known for providing sites to the commercial customer that

18 are efficient, clean and safe at all hours of the day or

19 night," and that's in your operations manual; right?

20    A    Yes, it is.

21    Q    And it's intended to let people, franchise owners

22 know that they're required to make sure that their sites, if

23 they're Pacific Pride sites, are efficient, clean and safe

24 at all hours; right?

25         MR. HART:  Object to the form of the question.

43

1          THE WITNESS:  What is the question?

2          (Requested question was read back.)

3          MR. HART:  Object to the form of the question.

4    What is "it"?

5      Q    BY MR. WEBB:  Well, I'm sure you can pick apart

6    everything I'm saying, but do you understand my question?

7      A    Not exactly.  I mean...

8      Q    Okay.  Well, I assume -- I'm asking you if this

9    statement in the operations manual is to let franchisees

10   know that they're required to keep their sites efficient,

11   clean and safe at all hours of the day?

12     A    Well, I think this sentence basically says it's a

13   description of how the Pacific Pride Commercial System would

14   like to be known to commercial customers.

15     Q    Well, it says is known; right?

16     A    Yes.

17     Q    So it's actually making a statement that this is

18   how it is known; right?

19     A    That is what the statement says.

20     Q    Okay.  Is the intention of this section of the

21   operations manual to let franchisees know that that's what's

22   expected of them?

23     A    I'm not sure exactly what the intention is.  I

24   didn't draft it, so...

25     Q    Well, as president of the company, you enforce it;

46

1     A    I don't have a specific date.

2     Q    Would it have been before you were president or

3     after?

4     A    Probably both.

5     Q    Okay.  So it directs itself -- and I'm -- to save

6     time here and eliminate a lot of time issues, it says, "Fuel

7     spills.  Now is the time to inspect your locations to make

8     sure your sites do not have contaminated areas caused by

9     accumulated spills."  Had you ever read that language in the

10    operations manual before?

11    A    I don't recall.

12    Q    Okay.  Would it be fair to ask you what your

13    understanding is of the company policy with respect to fuel

14    spills at franchises?

15    A    We think having fuel spills is a bad business

16    practice.

17    Q    Okay.  And that's because why?

18    A    Because they're environmental contaminations,

19    they're unsightly, and they're unsafe.

20    Q    Okay.  And they're unsafe because why?

21    A    Fuel is slippery.

22    Q    All right.

23    A    Also flammable.

24    Q    All right.  So is there a company policy about

25    cleaning up fuel spills?

47

1      A      It says here --

2             MR. HART:  Object to the form of the question.  Go

3      ahead.

4             THE WITNESS:  Says here, "We suggest the following

5      guidelines concerning spills and their prevention."  Item

6      two goes on to say, "Clean all spills as soon as possible

7      using an approved method."

8      Q      BY MR. WEBB:  Okay.  And if you look on the next

9      page, if you would, please, there's a subcategory seven

10     which says, "Develop a contingency plan."  You see that?

11     A      I see that.

12     Q      Okay.  And it talks about the training of

13     personnel.  Would you mind reading that to yourself -- or

14     I'll read it to you.

15            "Develop a spill contingency plan, including

16     training of your personnel and maintain an industry-approved

17     clean-up material on hand."

18            Did you know that Pacific Pride had that policy or

19     whatever they want to call it, suggestion?

20     A      We suggest it as a guideline.

21     Q      Okay.  And what does that mean, you suggest it as a

22     guideline?  That means you don't enforce it?

23            MR. HART:  Object to the form.

24            THE WITNESS:  We suggest it as a guideline.

25     Q      BY MR. WEBB:  Okay.  Do you enforce it?

57

1    interchange.

2        Q    Understood.  But you do require that they have at

3    least three different kinds of fuels on hand?

4        A    Yes, we do.

5        Q    And two of the three you specify; right?

6        A    That's correct.

7        Q    And they are what?

8        A    Diesel and gasoline.

9        Q    So to that degree, you are requiring that they have

10   certain types of fuel on hand, and a minimum of three

11   different types?

12       A    We do require that they have three grades of fuel.

13       Q    Okay.  And I take it as the president and somebody

14   who has been in the business for many years, you know that

15   this fuel has to be, in one way or another, delivered for it

16   to be distributed; right?

17       A    Yes.

18       Q    Okay.  And are there any rules or regulations about

19   how that's to be done by Pacific Pride?

20       A    No.

21       Q    Okay.  So you leave it up to the franchises to do

22   that?

23       A    Yes.

24       Q    But inherent in the understanding that they're

25   going to have at least three different fuel grades there is

58

1    that they're going to have to somehow get the fuel there;

2    right?

3          A     The fuel has to be at the site.

4          Q     Okay.  All right.  Now, if you could turn to the

5    next page of this, it's Exhibit 3, it says, "Pacific Pride

6    online."  Obviously we got this off the Internet.  It says,

7    "Safety Requirements and Fueling Guidelines."  Have you ever

8    seen this before?  It's six pages.

9          A     Yes.

10         Q     Okay.  And what is this intended to be, to the best

11   of your understanding?

12         A     Safety requirements and fueling guidelines.

13         Q     For customers?

14         A     Yes.

15         Q     Okay.

16         A     For end users.

17         Q     For end users.  Okay.  And is it still posted

18   online, if you know?

19         A     I believe it is.

20         Q     Tells the customer how to begin fueling?  You see

21   that?

22         A     Yes.

23         Q     What to do and what not to do?

24         A     Yes.

25         Q     Okay.  For instance, extinguish cigarettes, shut

69

1    per-transaction fee for foreign transactions.

2         Q    BY MR. WEBB:  I'll just let you answer the

3    questions your way from now on.

4              Okay.  So the point is, that is a charge that's

5    paid by -- out of the proceeds of San Francisco Petroleum if

6    the cardholder uses another location for gas; right?

7         A    I don't know what you mean when you say it's paid

8    out of the proceeds.  We charge San Francisco Petroleum a

9    transaction fee.

10        Q    Got it.  Now, as I understand it -- and we're going

11   to get to it in a minute -- the way that these fees are

12   actually obtained by Pacific Pride is that there are two

13   days per month that the money is taken out of an account; is

14   that right?  Electronic transfers?

15             MR. HART:  Object to the form of the question.

16             THE WITNESS:  Could you -- I don't -- when you say

17   the way the fees are obtained...

18        Q    BY MR. WEBB:  How do you collect your money?

19        A    We bill the franchisees twice monthly.

20        Q    Right.  But you don't wait for them to send you a

21   check, do you?

22        A    We do it through electronic funds transfer.

23        Q    How does that work?

24        A    We advise the franchisee several days in advance

25   that we're going to be drafting their account for the

73

1    Classen; right?

2        A    Correct.

3        Q    Okay.  Now, can we look at this next page of this

4    document?  You got it.  It says, "Advertising fee.  An

5    advertising fee is assessed on all foreign purchased

6    gallons.  Like a switching fee, this fee is a one-way

7    charge."  What does that mean, a one-way charge?

8        A    Charged to the card issuer.

9        Q    That would be, in this case, San Francisco

10    Petroleum; right?

11            MR. HART:  In what case?

12            THE WITNESS:  In which case?

13            MR. WEBB:  I apologize if I'm wrong.  We're dealing

14    with something that happened at S.F. Petroleum.

15            MR. HART:  But there was no transaction.

16        Q    BY MR. WEBB:  Who was the card issuer?

17        A    I don't know.

18        Q    Would it be a franchise?

19        A    Only a franchise can issue a Pacific Pride card.

20        Q    All right.  So when you say one-way charge to the

21    card issuer, you mean a one-way charge to the franchise?

22        A    We charge an advertising fee of fifteen-hundredths

23    of a cent on each transaction to the card issuer.

24        Q    Okay.  In the course of your duties as president,

25    can you tell me some of the uses of this money in connection

81

1    A    Yes.

2    Q    Okay.  And then it says, "Am I limited in the

3  number of cards I can distribute?"  And the answer is, "No.

4  The more cardholders, the greater your opportunity to

5  increase your volume and profits."  Is that an accurate

6  statement?

7    A    Yes.

8    Q    Okay.  Let's go to the next page.  In the middle of

9  the page there's a question that says, "What services are

10  available via the Pacific Pride Web site?"  Do you see that

11  one?

12    A    Yes.

13    Q    It says, "The Pacific Pride Web site services both

14  the franchisee and end users.  It has a complete listing of

15  all the locations on the system, along with search features

16  to direct users to the most convenient site."  Is that

17  accurate?

18    A    Yes.

19    Q    Okay.  And then it says, "The Web site also

20  contains safety instructions, new site listings, and

21  information to help manage your business."  Is that

22  accurate?

23    A    Yes, that's what it says.

24    Q    Okay.  Well, I know it says that, but you're the

25  president, and I'm asking you if it's accurate?

83

1   don't know; right?

2       A    If we received it, and they asked for

3   reimbursement, there would be records on it.

4       Q    Okay.  All right.  Then the next paragraph, the

5   last paragraph on this page, says, "The Pacific Pride System

6   is expanding rapidly."  Would you agree with that?

7       A    Yes.

8       Q    Okay.  And then we can turn to the third page

9   there.  Just a couple questions.  The first sentence where

10  it says, "Reach beyond to Profits."  Do you see that?

11      A    I have no idea where you are.

12      Q    All right.  Okay.  You with me now, "Reach beyond

13  to Profits"?

14      A    Yes.

15      Q    Okay.  It says, "Pacific Pride is nationally

16  recognized as the commercial fueling system leader."  You

17  see that?

18      A    I do.

19      Q    Is it, as far as you're concerned, nationally

20  recognized as the commercial fueling system leader?

21      A    I think it is.

22      Q    Okay.  What would be the second?  What would be the

23  company that would be in second place, in your opinion?

24      A    Probably the Commercial Fueling Network.

25      Q    That's another name?

87

1       A    No.

2       Q    Okay.  If it were a Pacific Pride sign, and this is

3    a picture sent in with a self-inspection, would it pass

4    muster?

5            MR. HART:  Object to the form of the question.

6            THE WITNESS:  There's no Pacific Pride facility

7    visible on this thing.

8       Q    BY MR. WEBB:  So you can answer my question.  Would

9    it pass muster as part of an inspection?

10      A    It wouldn't be recognized as a Pacific Pride site.

11      Q    All right.  Okay.  Have you looked at any documents

12   in connection with your -- preparation for this deposition,

13   sir?

14      A    No.

15      Q    All right.  So then did you know -- and I don't

16   want to know what your attorney told you -- but did you know

17   that there were OSHA violations that were assessed in

18   connection with the accident that's the subject of this

19   case?

20      A    No.

21      Q    Do OSHA violations concern you if they're brought

22   to your attention at a Pacific Pride location?

23           MR. HART:  Object to the form of the question.

24           THE WITNESS:  Not directly.

25      Q    BY MR. WEBB:  How about indirectly?

88

1      A    No.

2      Q    Okay.  It's not part of the self-inspection

3   critique that's necessary for a franchise to report to you

4   that they've been cited by OSHA?

5      A    No.

6      Q    Okay.  Is it part of the self-inspection to let you

7   know that someone was seriously injured on a Pacific Pride

8   location?

9           MR. HART:  Object to the form of the question.

10          THE WITNESS:  No.

11     Q    BY MR. WEBB:  Okay.  And it's fair to say that

12  that's just not part of Pacific Pride's interest; right?

13     A    It has nothing to do with us.

14     Q    I see.  Okay.  All right.  So then the last

15  exhibit, I'm happy to tell you, is 9.  And I think we should

16  take a break, because I'll probably have an hour or so with

17  you on this, and it's the last exhibit, and we're going to

18  eat lunch soon.

19          MR. WEBB:  Is that okay with you, Peter?

20          MR. HART:  Well --

21          MR. WEBB:  Off the record for a second.

22          THE VIDEOGRAPHER:  We're off the record.

23          (Recess taken.)

24          THE VIDEOGRAPHER:  We're back on the record.  The

25  time is 11:54 a.m.  Counsel may proceed.

1          MR. WEBB:  Yes, thank you.

2     Q    BY MR. WEBB:  Okay.  So I have in front of you

3   Exhibit 9 which we're going to get into at length, so we can

4   get started with it now.

5          (Deposition Exhibit No. 9 was marked for

6   identification by Mr. Webb.)

7     Q    BY MR. WEBB:  Is it fair to say you have over

8   fourteen hundred franchise locations now; right?

9          MR. HART:  Object to the form of the question.

10    Q    BY MR. WEBB:  I'm not trying to trick you.  I'm

11  just --

12    A    I don't think we do, no.

13    Q    You have less?

14    A    Yeah.

15    Q    Okay.  How many do you think you have?

16    A    I think there's about twelve hundred and something.

17    Q    Okay.  So it used to be fourteen hundred, according

18  to the literature, but now you lost --

19    A    No.  There's some sites that accept Pacific Pride

20  cards that are not franchise locations.

21    Q    Okay.  Now, I've been to S.F. Petroleum, and that

22  actually has people working there from certain hours of the

23  day during the week.  I mean, it's actually an active

24  location for petroleum and things of this nature.  And I

25  also saw the site here near where I'm staying, and it seems

91

1    I'm aware of.

2         Q    BY MR. WEBB:  Okay.  You know that lubricants are

3    sometimes used in the gasoline business; right?

4         A    Lubricants?  Is that a question?  Are lubricants

5    sometimes used in the gasoline business?

6         Q    Yes.  Did you know that?

7         A    I guess all kinds of things could be used, so...

8         Q    Well, lubricants such as oils, gasoline oils,

9    things of this nature, like transmission oil, or engine oil?

10   I'm calling those lubricants.

11        A    When you say, "used in the gasoline business," what

12   do you mean by that?

13        Q    Sold.

14        A    Sold?  Oh.

15        Q    Yeah.

16        A    Some people that sell gasoline also sell

17   lubricants, yes.

18        Q    Is it fair to say some of the Pacific Pride

19   franchises sell lubricants?

20        A    Yes.

21        Q    Do you know how many?

22        A    No.

23        Q    Would you estimate how many?

24        A    I could estimate.

25        Q    Okay.

92

1      A    I would say probably the majority of them.

2      Q    Okay.  Do you know that lubricants usually come in

3   drums?

4      A    They can come in drums.

5      Q    Okay.  Do you know how lubricants are transported

6   inside the franchise as a rule?

7      A    They're not.

8      Q    Well, how do they get them off the truck?

9      A    The franchise doesn't have anything to do with

10  transportation.

11     Q    Okay.  But they have to move the lubricants in

12  order to relocate them to sell them; right?

13          MR. HART:  Object to the form of the question.

14     Q    BY MR. WEBB:  If you know.

15     A    Who is "they"?

16     Q    Well, what do they do with the lubricants at these

17  franchises that sell them?

18     A    I don't know.

19     Q    Okay.  Is it part of the Pacific Pride System that

20  they shall sell lubricants or they shall not sell

21  lubricants --

22     A    No.

23     Q    -- or no rule on that?

24     A    There's no rule.

25     Q    Okay.  But it happens that -- you're telling me

93

1   that you're estimating that more than half of them do?

2       A    Yes.

3       Q    Do you know if forklifts are used in connection

4   with the use and the sale of lubricants?

5       A    By some people, yes.

6       Q    Okay.  Some Pacific Pride franchises?

7       A    I would assume so.

8       Q    All right.  Is that --

9       A    I wouldn't have any direct knowledge of it, but I

10  would assume so.

11      Q    Okay.  Do you have any guidance or directions as to

12  which lubricants they may or may not sell?

13      A    No.

14      Q    Do you have any say over that?

15      A    No.  Lubricating oil is not part of our franchise

16  offering.

17      Q    Okay.  But is there anybody at Pacific Pride who

18  monitors what lubricants are being sold?

19      A    No.  They're not part of our business.

20      Q    You don't take a share of the sale of those items?

21      A    We take a share of any transaction that occurs on

22  the Pacific Pride network.  If somebody happens to sell

23  lubricating oils through a vending machine, and there's a

24  transaction associated with that sale, we would charge them.

25      Q    So if somebody were to buy lubricants through a

94

1    franchise, and a Pacific Pride access card were used for

2    that transaction, you would take a share of that?

3        A    We take a share of any transaction on the Pacific

4    Pride network.

5        Q    Is there some code that exists at your headquarters

6    that would indicate that lubricants had been a part of the

7    transaction that you received a share for?

8        A    Yes.

9        Q    What would that code be, if you know?

10       A    It would show it as lubricants.

11       Q    Okay.  Are there records that indicate -- I assume

12   there are -- there are records that indicate how much

13   lubricant business you did in the year 2005?

14       A    There certainly would be something that would show

15   how many transactions occurred using that product code.

16       Q    Okay.  Is there a specific amount that Pacific

17   Pride receives as a part of that transaction such as we saw

18   a certain amount per transaction of a foreign purchase, a

19   certain amount per royalty transaction, et cetera.  Is there

20   a set amount that you charge?

21       A    Every transaction that occurs is dealt with in the

22   same fashion, whether it's unleaded regular or lubricating

23   oil.

24       Q    Okay.  So just hypothetically, if somebody bought

25   ten dollars' worth of lubricant oil, what would that

95

1    transaction derive for Pacific Pride, if on an access card?

2        A    A transaction on an access card that's a foreign

3    transaction would be thirty-five cents for an optical card

4    and twenty cents for a magnetic-striped card.

5        Q    Regardless of the quantity of the sale?

6        A    Yes.

7        Q    So it could be a hundred dollars, you'd still get

8    the thirty-five cents or the twenty cents?

9        A    Transaction is a transaction, regardless of its

10   size.

11           MR. WEBB:  Okay.  Why don't we take a lunch break?

12   Is that okay?

13           THE VIDEOGRAPHER:  We're off the record.

14           (Lunch break from 12:04 p.m. to 12:20 p.m.)

15           THE VIDEOGRAPHER:  We're back on the record.  The

16   time is 12:20 p.m.  Counsel may proceed.

17           MR. WEBB:  Yes, thank you.

18       Q    BY MR. WEBB:  Mr. Harris, before we get to this

19   last big exhibit, I would like to ask you just a few

20   questions I have in my notes.

21           I was wondering if you could tell me, why is it, if

22   you know, that Pacific Pride insists on 24/7 access to its

23   stations?

24       A    So that the fleet customers have the opportunity to

25   fuel twenty-four hours a day.

98

1    A    Have you got any suggestions for how we might

2    market?

3    Q    And would that be something directed to you as the

4    president or --

5    A    Could be.  Could be directed to anybody in the

6    company.

7    Q    All right.  And have you had such conversations?

8    A    Yes.

9    Q    Can you recall the substance generally of what you

10   tell them?

11   A    Yes.

12   Q    What is that?

13   A    Well, if you want the full marketing deal, that

14   would take me about eight hours to go through.  But

15   basically talks about how to target certain types of

16   customers and certain types of marketing methods; certain

17   types of compensation schemes for salespeople; certain types

18   of advertising.  A whole range of things.

19   Q    Okay.  So, basically, you help them to figure out

20   how to market the product to certain populations of

21   prospective customers?  Is that --

22   A    If somebody calls me and asks for my opinion on how

23   they might become more effective, I provide them with my

24   opinion.

25   Q    All right.  But you're not going to take eight

**EXHIBIT 4**

## APPENDIX I

### PACIFIC PRIDE REGISTERED TRADEMARK



**Item 6.**

**OTHER FEES**

| Name of Fee (1) and (2) | Amount | Due Date | Remarks |
|---|---|---|---|
| Transaction Fee for Foreign Purchases | $.35 per transaction originating from a Pacific Pride Optical Card.<br><br>$.20 per transaction originating from a Pacific Pride Blue Card.<br><br>$.20 per transaction originating from a Pacific Pride Network, Network Plus, or Network Super Plus Card under the Basic Service Level.<br><br>$.29 per transaction originating from a Pacific Pride Network, Network Plus, or Network Super Plus Card under the Enhanced Service Level.<br><br>$.48 per transaction originating from a Pacific Pride Network, Network Plus or Network Super Plus Card under the Receivable Management Service Level.<br><br>$.48 per transaction originating from a Pacific Pride Network, Network Plus, or Network Super Plus Card under the Payment Guaranteed Service Level plus 1.25% of the gross sales transaction as adjusted. | Payable to us on the 8th and 23rd of each month. | A switch occurs any time information is exchanged on the Pacific Pride System such as Foreign Purchases. (3)<br><br>There are currently two billing periods in every month.<br><br>~~We anticipate offering the Basic Service Level and Enhanced Service Level by the summer of 2006 and the Receivable Management Service Level and the Guaranteed Service Level by the end 2006. (4)~~ |

| Name of Fee (1) and (2) | Amount | Due Date | Remarks |
|---|---|---|---|
| Transaction Fee for Local Sales | $.20 per transaction originating from any Pacific Pride Blue Card.<br><br>$.20 per transaction originating from a Pacific Pride Network, Network Plus, or Network Super Plus Card under the Basic Service Level.<br><br>$.29 per transaction originating from a Pacific Pride Network, Network Plus, or Network Super Plus Card under the Enhanced Service Level.<br><br>$.48 per transaction originating from a Pacific Pride Network, Network Plus or Network Super Plus Card under the Receivable Management Service Level.<br><br>$.48 per transaction originating from a Pacific Pride Network, Network Plus, or Network Super Plus Card under the Payment Guaranteed Service Level plus 1.25% of the gross sales transaction as adjusted. | Payable to us on the 8th and 23rd of each month. | Does not apply to purchases made with optical cards.(3), (4)<br><br>A Local Sale occurs when fuel is sold at your site to your customer.<br><br>We reserve the right to charge Local Sales Fees for optical cards upon 30 days written notice. |
| Advertising Fee for Pacific Pride | $.0015 for each gallon of Foreign Purchases of fuel made with a Pacific Pride Optical Card and/or any Pacific Pride Magnetic Stripe Card. | Payable to us on the 8th and 23rd of each month. | These fees are deposited in the Pacific Pride Advertising Fund. (3). |
| Royalty Fee | $.005 per gallon of Foreign Purchases of fuel made with a Pacific Pride Optical Card and/or any Pacific Pride Magnetic Stripe Card. | Payable to us on the 8th and 23rd of each month. | (3) |
| Transfer of Funds Fee | $10.00 for transfers to up to 10 other System Participants and $.25 for each transfer to a System Participant over 10 | Payable to us on the 8th and 23rd of each month. | A transfer occurs when we pay monies to another System Participant for Foreign Purchases made by your customers.  (3) |
| Payment for Foreign Purchases of Fuel for Franchises with an Exclusive Territory, except for Approved Retail Sites. | Base price for fuel plus all applicable taxes, freight, other approved and necessary costs, plus $.05 per gallon. | Payable to us on the 8th and 23rd of each month. | The base price is established by a process described in the Operations Manual. (3) |

Pride. The SmartLock™ System must be purchased from Pacific Pride or other vendor designated by Pacific Pride. Pacific Pride reserves the right to change equipment specifications and vendors as it deems necessary.

(3)     The Pacific Pride controller is a dedicated computer system for managing the exchange of information between you and us. The cost includes hardware, software and installation. Any travel costs incurred to install the controller at your office must be reimbursed by you to the Installer.

(4)     Specifications for certain of the petroleum equipment are located in the Pacific Pride Operations Manual. Costs of equipment will vary depending on the supplier, size of the site location and market factors. The range of costs given in the chart above is a range for the typical costs and cannot be relied upon as an absolute because we have no control over the costs charged by your suppliers.

(5)     We must approve any additional proposed site locations as described in Item 11.

(6)     The contract provides 24 hour service and on site maintenance for the controller. The contract is with a national computer company.

(7)     You must also pay the travel and room and board expenses of the installer of the controller. Such expenses will vary depending on the location of the Pacific Pride site and the distance the installer is required to travel.

(8)     You are responsible for paying all costs for room, board and transportation and related expenses to attend the mandatory Orientation Training in Salem, Oregon. Transportation costs will vary significantly depending on where you reside and whether you travel by air, train, automobile or bus. If you reside in Salem, Oregon, you may have no transportation costs. If you are traveling from the east coast, airfare may cost as much as $2,000. Costs of room and board in Salem, Oregon will range between $60 and $200 per night.

(9)     If you do not own adequate real property and improvements which meet our specifications, you will be required to purchase or lease the land and improvements. It is not possible to estimate the amount or describe the range of amounts you will spend to purchase or lease real property and improvements for your franchise site. The amount will depend on the size, location, and condition of the purchased or leased property. The actual site where you conduct your business can be of your own choosing provided the Pacific Pride site is approved by us. If you have a supplemental agreement which allows you to operate PrideNet sites, the PrideNet sites may be located in any area except a territory of another franchisee, provided the site is approved by us. Pacific Pride sites are typically located in commercial and/or industrial areas. The individual site must not be less than 10,000 square feet and may be as large as desirable. There is no building requirement for either the Pacific Pride or PrideNet sites, however, the shelter which houses the automated fueling components must conform to equipment specifications as set forth in the Pacific Pride Operations Manual. PrideNet sites have no minimum square footage. If you do not own your own site, leasing costs (subject to the location and size of property) would be expected to include a monthly charge and a 2 month security deposit.

The foregoing costs will vary up or down depending upon the particular location. Lease and security deposits may be held by a landlord after expiration of the lease, or expiration or sale of the franchise, to provide for any unascertainable events. In addition to the above charges and deposits, you may have long term lease obligations.

earn interest.  At the expiration or termination of the franchise, any security, or balance of the security deposited by you, (plus any accrued and unpaid interest, if any) less amounts owing by you to other System Participants, will be returned to you within 90 days of expiration or termination.

We reserve the right at any time to require you to amend the Letter of Credit, deposit additional funds into the interest bearing account, or increase the amount of the bond or other security in order that the amounts should equal the Estimated Net Billing or $10,000.00, whichever is greater. If the security is not adequate, we may refuse to ~~punch~~produce access cards for issue to your customer, until such time as you provide the required security.  In addition, we have the right to invalidate cards issued to your customers if you fail to provide the required security. You must not allow the security to expire or lapse.

(14)  Insurance Required: You must maintain the following insurance coverage:        $2 Mill

    a.    Public liability insurance as to each of your sites in an amount not less than $~~1~~2,000,000.00 per site per occurrence for bodily injury and death to one or more persons and $~~5~~1,000,000.00 for property damage per Site per occurrence with an aggregate limit of $4,000,000.00 per policy year.

$ 1 Mill —

    b.    Product liability insurance as to each of your sites which dispenses fuel which has been mixed or blended by you, in an amount not less than $~~1~~2,000,000.00 per ~~site~~ site per occurrence for bodily injury and death to one or more persons and an amount not less than $~~5~~1,000,000.00 for property damage per ~~s~~Site per occurrence with an aggregate limit of $4,000,000.00 per policy year.

    c.    Any other insurance coverage which may be required by federal, state, or local statute, law, rule, or regulation.        _various liability_

The required insurance policies must name us as an additional insured and you must provide us with Certificates of Insurance which require ~~ten~~thirty days notice to us before cancellation.  The amount of the premiums for insurance coverage may vary depending on location.

The required insurance policies must also name all other System Participants as an additional insured, but coverage for other System Participants is only for claims arising at or from your Pacific Pride sites.  You must provide us with Certificates of Insurance which require ten days notice to us before cancellation.  The amount of the premiums for insurance coverage may vary depending on location.

(15)  Additional funds for miscellaneous costs for ongoing operational expenses, some of which will be incurred in the start up phase, will be required.  Estimated ranges of such costs are as follows:

| | |
|---|---|
| Opening Promotion and Sales Effort | $3,000.00 to $8,000.00 |
| Fees and Licenses | $100.00 to $5,000.00 |
| Repairs | $500.00 to $20,000.00 |
| Accounting Services | $300.00 to $3,000.00 |
| Utility Deposits | $0.00 to $600.00 |
| Applicable Taxes and Tax Deposits | $0.00 to $20,000.00 |
| Other | $0.00 to $20,000.00 |
| Total | $3,900.00 to $82,000.00 |

If you accept other third party cards approved by PACIFIC PRIDE at your PACIFIC PRIDE Sites, we will receive payment from the third party companies based on the volume resulting from the third party card purchases.

We derive revenue from each item we sell or service we provide to you. We do not derive revenue from any sales made to you from other suppliers except from the sale of the SmartLock™ System as specified above.

There currently are no purchasing or distribution cooperatives.

### Item 9.

### FRANCHISEE'S OBLIGATIONS

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AGREEMENT AND OTHER AGREEMENTS. IT WILL HELP YOU FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THESE AGREEMENTS AND IN OTHER ITEMS OF THIS DISCLOSURE DOCUMENT.

| Obligation | Section of Agreement (References to Franchise Agreement are to both levels of franchises) | Item in Offering Circular |
|---|---|---|
| A. Site Selection and Acquisition/Lease | Section 5 of Franchise Agreement And Section 4 of Supplemental Agreement | Items 7 and 11 |
| B. Preopening Purchases/Leases | Section 11, 13 and 15 of Franchise Agreement And Section 9 of Supplemental Agreement | Items 7 and 8 |
| C. Site Development and Other Preopening Requirements | Section 15 of Franchise Agreement And Section 4 of Supplemental Agreement | Items 6, 7 and 11 |
| D. Initial and Ongoing Training | Section 7 of Franchise Agreement And Section 9 of Supplemental Agreement | Item 11 |
| E. Opening | Section 15 of Franchise Agreement And Section 9 of Supplemental Agreement | Item 11 |
| F. Fees | Sections 3, 4, and 14 of Franchise Agreement And Section 8 of Supplemental Agreement | Items 5, 6 and 7 |
| G. Compliance with Standards and Policies/Operating Manual | Section 9 of Franchise Agreement and Section 6 & 7 of Supplemental Agreement | Item 11 |

| Provision | Section in Franchise Agreement | Section in Supplemental Agreement | Summary |
|---|---|---|---|
| H. Cause Defined/Defaults Which Cannot be Cured | Section 21,A,2 | Section 13 | Noncurable defaults include failure to actively operate your site as required, unapproved transfers, material misrepresentations, conviction of a felony, unauthorized use or disclosure of the Manual or confidential information, an assignment for the benefit of creditors, conduct which has a material adverse effect on our mark, conduct poses an immediate threat to health and safety |
| I. Your Obligations on Termination/Non Renewal | Section 22 | Section 13, F | Obligations include payment of outstanding amounts, complete the reidentification, return of confidential materials, assignment of telephone numbers to us, return of all card numbers and access cards you have issued. (also see R. below). |
| J. Assignment of Contract by Us | Section 24,ED | Same as Franchise Agreement | No restriction on our right to assign. |
| K. Transfer by You Defined | Section 24,B | Section 15 | Includes transfer of franchise or site, or all or any part of ownership of you (if you are a corporation, partnership or limited liability company). |
| L. Our Approval of Transfer by Franchisee | Section 24 | Section 15 | We have the right to approve all transfers. |
| M. Conditions for Our Approval of Transfer | Section 24 | Section 15 | New franchisee qualifies, you pay us all amounts due, transferee assumes your agreement, transfer fee paid, training completed, we approve material terms, general release, you execute a noncompetition covenant, refurbishing of site to then current standards, all obligations assumed by transferee. |
| N. Our Right of First Refusal to Reacquire Your Business | Sections 20,B,2 and 22,A, 2 and B,2 | Same as Franchise Agreement | We can match any offer for your franchise related business assets. |
| O. Our Option to Purchase Your Business | None | None | |
| P. Your Death or Disability | Section 25 | Same as Franchise Agreement | Franchise or an ownership interest in you must be assigned to an approved buyer within 12 months from your date of death or disability. |

| Obligation | Section of Agreement (References to Franchise Agreement are to both levels of franchises) | Item in Offering Circular |
|---|---|---|
| W.    Non-Competition Covenants | Section 19 of Franchise Agreement | Item 17 |
| X.    Dispute Resolutions | Section 19 of Franchise Agreement | Item 17 |

### Item 10.

## FINANCING ARRANGEMENTS

We do not offer direct or indirect financing. We do not guarantee your note, lease or obligation.

We may become aware of the availability of favorable financing from a lender and will provide that information to you if requested, but we will not receive a benefit from the financing.

### Item 11.

## FRANCHISOR'S OBLIGATIONS

Except as listed below, we are not required to provide any assistance to you. All section and page numbers in the first parenthesis refer to the franchise agreement and the section and page numbers in the second parenthesis refer to a supplemental agreement, if any.

<u>Our Obligations Before Opening a Site</u>. Before you open a site, we will:

(1)    Before the execution of the franchise agreement, designate a territory for you. The territory is exclusive unless you or your related companies or family members operate a site affiliated with a business similar to Pacific Pride System. With an exclusive territory, you have the exclusive right to operate Pacific Pride sites and the exclusive right to accept Pacific Pride optical cards, except for the reservation of rights discussed in Item 12. You may accept or reject a proposed new Pacific Pride Site, PrideNet, or AmeriNet Site within your territory. By signing the franchise agreement, you accept all existing Pacific Pride, AmeriNet, and PrideNet sites in your territory. (Section 15, A, 1).

(2)    Approve a Pacific Pride site. We do not select the specific site on which you choose to open a Pacific Pride site, however, we must approve the site in writing. Approval of a Pacific Pride site is at our discretion. We consider many factors such as proximity to commercial traffic flow, proximity to business or industrial areas, size of the lot which may not be less than 10,000 square feet, proximity to major highways, and compliance with all governmental and regulatory requirements. If you also sign a supplemental agreement, we may approve a PrideNet site. We do not select the specific site on which you choose to open a PrideNet site. However, we must approve the site in writing. Approval of a PrideNet site is at our discretion. We consider compatibility with the neighborhood, availability of other Pacific Pride sites and PrideNet sites, suitability of the Zip Code Area for a Pacific Pride site, and available prospects for a new franchise



in that Zip Code Area.  Requests for a Pacific Pride site shall be given priority over a PrideNet site. We cannot and do not guarantee the viability and ultimate profitability of any site we approve, and you are expected to perform your own investigation and evaluation of the site.  (Section 15, A, 2) (Section 4, B).

(3)     The site approved must be within your territory.  (Section 15,A,2).

(4)     Loan to you one copy of the Pacific Pride Operations Manual.  (Section 15, A, 3).

(5)     Give to you an opening promotional advertising kit consisting of a minimum of 200 miscellaneous Pacific Pride brochures and other promotional materials before the opening of your first Pacific Pride site.  (Section 15, A, 4), (Section 9).

*Training*

(6)     Train you or your designated representative at an Orientation Training.  The training is for 22.5 hours and is held over 3 days at our home office and 1 day at your site.  (Section 7, A, and Section 15, A, 6), (Section 9).  *PP rep has been onsite*

(7)     Give you one Pacific Pride sign for use at your first Pacific Pride Site.  (Section 15,A,7).

*Dictate quality standards*

(8)     Provide all necessary standards and specifications for equipment, inventory and other materials necessary for the operation of your sites.  The quality standards and specifications are detailed in the Pacific Pride Operations Manual. (Section 15, A, 7), (Section 9).

(9)     Provide information necessary for management and operation of a your sites on the Pacific Pride System.  (Section 15, A, 8), (Section 9).

(10)    Provide the necessary access codes and accounting information requirements for issuance of Pacific Pride access cards. (Section 15, A, 9), (Section 9).

(11)    Produce or contract with a third party to produce the Pacific Pride optical and magnetic stripe cards for your customers upon receipt of an order from you.  (Section 15, A, 10), (Section 9).

(12)    If requested by you, we will provide the names of vendors for any equipment, material, inventory, supplies, or any other item necessary for the operation of your sites.  (Section 15, A, ~~11~~12), (Section 9).

(13)    Arrange for the installation of the Controller.  (Section 15, A, ~~12~~13).

Our Obligations During Operation:  During the operation of your franchise business, we will:

(1)     Continue to loan to you a copy of the Pacific Pride Operations Manual.  (Section 15, B, 1), (Section 9).

(2)     Provide technical assistance and respond to inquiries about problems relating to the operation or use of any equipment sold to you by us.  (Section 15, B, 2), (Section 9).

(3)     Perform all of our duties and obligations as set out in the Pacific Pride Operations Manual, the franchise agreement, and the supplemental agreement, if any.  (Section 15, B, 3), (Section 9).

(11)(18)    You shall not authorize any sale through the Pacific Pride System which is not authorized by your SmartLock™ System or other approved equipment, unless you have stand-in processing, which is approved by Pacific Pride.    You may authorize a sale through the Pacific Pride System if your SmartLock™ System or other approved equipment is not operational, but the product is available. However, there is no guarantee of payment.

(19)    In this paragraph "you" shall refer to you, your agent, employees, or contractors.    You shall not issue a Pacific Pride card to a customer who of any other Pacific Pride franchisee with an exclusive territory or to a customer of an AmeriNet franchise which customer is in possession of a Pacific Pride card, or an AmeriNet card, and has used such card or cards to make purchases from the Pacific Pride System, or the AmeriNet System or the other Joint User's network within the prior nine months.    However, you may respond to a formal bid.    You may issue a Pacific Pride access card to customers of another Pacific Pride franchisee who only has a nonexclusive territory.    You shall not market customers in any area where a new Pacific Pride site in an exclusive territory, a new PrideNet site in a zip code area with no prior sites, or a new AmeriNet site is located from the time we announce that the site is going to be opened until the site has been opened for 180 days.    Nor shall you interfere with the customer relationship that exists between any customer and the Pacific Pride franchisee or AmeriNet franchisee who owns the account.    Subject to these restrictions, you may solicit customers outside of your territory.    In the event a dispute arises between System Participants as to the issuance of an access card and the dispute cannot be resolved by the parties and/or us, you agree to submit the dispute first to mediation, and if no resolution is reached, then to binding arbitration for resolution.    If the arbitrator finds that you have violated the provisions of this paragraph, the penalty for the violation shall be a maximum amount of three (3) times the complaining franchisee's gross profits related to the account for the twelve months before losing the account, plus attorney fees of the complaining franchisee. Each party will pay one-half of the cost of mediation and/or arbitration.

(20)    If you have a nonexclusive territory, we may provide restrictions relating to where and how you may issue PACIFIC PRIDE Access Cards.    Restrictions may include geographical restrictions and time restrictions and will be determined on a case by case basis.

(21)    If the acts or omissions of your customers or the customers' employees or agents cause any damage to or at another System Participant's site, you shall provide the other System Participant with information necessary for the other System Participant to locate the customers and take such action they deem appropriate.

(22)    You shall only issue access cards which have been coded to allow for purchase of high sulfur diesel fuel for off-road vehicles if you sell high sulfur diesel fuel for off-road vehicles at one of your sites.

(23)    You shall ensure that your sites are sufficiently well lit to provide for safe and convenient access 24 hours a day.

(24)    You shall ensure that customers are provided with convenient and safe access to and from your sites.

(25)    You shall at all times maintain the physical condition and appearance of all of your sites up to the minimum standards as detailed in the Operations Manual.    These standards are subject to change at our discretion.    You shall complete and submit an inspection report form to us, upon written request.

(26)    You shall make sure your Pacific Pride equipment is operational at all times and is used only as allowed by your franchise agreement.

**EXHIBIT 5**

## SECTION 4.  INITIAL FRANCHISE FEE

A.        Franchise Fee.  FRANCHISEE shall pay a franchise fee in the amount of $8,000.00 to PACIFIC PRIDE.  The franchise fee shall be paid in full to PACIFIC PRIDE upon execution of this Agreement. This franchise fee shall be fully earned by PACIFIC PRIDE at time of payment and is non-refundable.

B.        In order for FRANCHISEE to operate a PACIFIC PRIDE Site within a territory different than the one granted under this Agreement, an addendum to this Agreement must be executed which includes the new zip code area as part of the Territory, and FRANCHISEE must submit a New in the form of a Site Application and Approval Form attached to this Agreement as Appendix IV, which includes the new zip code area as part of the Territory.  A site hook-up fee will be required for any new Site opened in the new zip code area.  This Agreement does not grant FRANCHISEE the right to operate a PrideNet Site.  In order to operate a PrideNet Site, FRANCHISEE must execute a separate supplemental agreement with PACIFIC PRIDE.  PACIFIC PRIDE may grant FRANCHISEE the right to operate an Approved Retail Site, if the provisions of Section 5.C are met.

C.        Included as part of the franchise fee, Pacific Pride shall provide FRANCHISEE with a Pacific Pride sign for the first PACIFIC PRIDE Site opened by FRANCHISEE. FRANCHISEE shall pay for the shipping cost of the sign to FRANCHISEE'S Site.

## SECTION 5.  SITE LOCATION AND RELATED FEES

A.        Original Site.  Prior to granting Zip Code Area(s) as a territory to FRANCHISEE, FRANCHISEE must submit a New Site Application and Approval Form attached to this Agreement as Appendix IV.  PACIFIC PRIDE must approve in writing a proposed site location for a PACIFIC PRIDE Site within each Zip Code Area.  Approval of sites is within the sole discretion of PACIFIC PRIDE.  PACIFIC PRIDE will consider accessibility to commercial traffic, proximity to major roadways and interchanges, size of the specific site which may not be smaller than 10,000 square feet, but may be as large as desirable, proximity to commercial and/or industrial districts, compatibility with the neighborhood and preliminary compliance with all governmental and regulatory requirements.  Any approval shall be conditioned upon obtaining full compliance with governmental and regulatory requirements. FRANCHISEE may not open the PACIFIC PRIDE Site until compliance with all governmental and regulatory requirements have been met. FRANCHISEE must open its PACIFIC PRIDE Site within 90 days of the date of this Agreement unless an extension is granted in writing by PACIFIC PRIDE.

B.        Additional PACIFIC PRIDE Sites.  FRANCHISEE is not limited by this Agreement as to the number of PACIFIC PRIDE Sites it may operate within its Territory, however each site must be approved by PACIFIC PRIDE as described in Paragraph A above and is subject to the terms of this Agreement.  Each subsequent proposed PACIFIC PRIDE Site location within FRANCHISEE'S Territory must also be approved in writing by PACIFIC PRIDE.  FRANCHISEE shall complete and submit a New Site Application and Approval Form to PACIFIC PRIDE at least 30 days in advance of the proposed site opening. PACIFIC PRIDE, in its sole discretion, may grant

M.          FRANCHISEE shall not use the PACIFIC PRIDE Marks or name or PrideNet Marks or name as part of its corporate or other business name. FRANCHISEE is required to use an identifier that the FRANCHISEE is an independent FRANCHISEE in combination with the use of the Marks as prescribed in the Operations Manual. FRANCHISEE shall not license, register or purchase vehicles, fixtures, products, supplies or equipment, or perform any other activity or incur any obligation or indebtedness except in its individual, corporate or other business name. FRANCHISEE may, however, identify itself as a PACIFIC PRIDE FRANCHISEE as prescribed in the Operations Manual.

N.          FRANCHISEE may use the PACIFIC PRIDE Marks as an identifier on a web page only if FRANCHISEE is identified as an independent FRANCHISEE of PACIFIC PRIDE.

O.          Each and every detail of the PACIFIC PRIDE System is important to PACIFIC PRIDE, to FRANCHISEE, and to other PACIFIC PRIDE franchisees in order to develop and maintain uniformity of services and products, and to enhance the reputation, trade demand and goodwill of PACIFIC PRIDE. FRANCHISEE accordingly agrees to the following:

     1.     To adopt and use the Marks solely in the manner prescribed by PACIFIC PRIDE; and

     2.     To carry out its business under the Marks in accordance with this Agreement and with operational standards established by PACIFIC PRIDE, and as set forth in the Operations Manual and/or other documents as are provided to FRANCHISEE.

P.          If it becomes advisable at any time, in the sole discretion of PACIFIC PRIDE, to modify or discontinue use of any of the Marks, and/or use one or more additional substitute trade or service marks, FRANCHISEE agrees to comply therewith, at its own expense, within a reasonable time after notice thereof by PACIFIC PRIDE. PACIFIC PRIDE may require FRANCHISEE, at its own expense, to purchase and install new signs containing such new mark at FRANCHISEE'S Sites and to remove from such Sites any inconsistent signs.

Q.          In order to preserve the validity and integrity of the proprietary mark and copyrights, and to assure that FRANCHISEE is properly using the same in the operation of its Franchise, PACIFIC PRIDE or its agents shall at all reasonable times have the right to enter and inspect FRANCHISEE'S Premises, and additionally, shall have the right to observe the manner in which FRANCHISEE is rendering its services, to confer with FRANCHISEE'S employees and its Accounts, and to select products for testing and evaluation in order to make certain that they are satisfactory and within the minimum product specification provisions established by PACIFIC PRIDE.



R.          FRANCHISEE shall keep all Intellectual Property of PACIFIC PRIDE and/or its contractors that is not in the public domain confidential and will not at any time allow such Intellectual Property, or any of the various components thereof or any modifications thereto, to be disclosed to third parties, sold, assigned, leased or commercially exploited or marketed in any way, with or without charge, by FRANCHISEE or its employees or agents, except as expressly

1214. FRANCHISEE shall allow all Accounts of System Participants to access its PACIFIC PRIDE Equipment in order to purchase Fuel as allowed by the coding for that Account's Access Card and as required and approved by PACIFIC PRIDE and the System Participant which issued the Access Card, except FRANCHISEE may choose not to accept Access Cards issued by Comdata. If FRANCHISEE elects to accept Access Cards issued by Comdata, FRANCHISEE must first enter into a written agreement with Comdata.

1315. If at a PACIFIC PRIDE Site, FRANCHISEE also sells to customers who are not Bonafide Commercial Accounts, but rather are purchasers of retail fuel for personal use, it is required that a separate island of pumps which are clearly marked "PACIFIC PRIDE", be maintained solely for the use of Accounts of System Participants, unless approved in writing by PACIFIC PRIDE. Approved Retail Sites are not required to have a separate island of pumps for PACIFIC PRIDE sales.

1416. FRANCHISEE'S Sites shall have paper towels and necessary equipment to allow Accounts to wash windows and FRANCHISEE shall equip all of its Sites with air and water for use by Accounts at no cost to the Accounts. PACIFIC PRIDE may waive the requirement to provide for air and water if this should prove impractical or not economically feasible for FRANCHISEE to comply.

1517. FRANCHISEE shall at all times maintain the physical condition and appearance of all of FRANCHISEE'S Sites up to the minimum standards as detailed in the Operations Manual. These standards are subject to change at the discretion of PACIFIC PRIDE. FRANCHISEE shall complete and submit a PACIFIC PRIDE inspection report form to PACIFIC PRIDE, upon written request of PACIFIC PRIDE.

1618. FRANCHISEE shall grant PACIFIC PRIDE the right to inspect its Premises, including FRANCHISEE'S books and records, at any reasonable time. FRANCHISEE shall make every effort to assist PACIFIC PRIDE during any inspection by PACIFIC PRIDE. FRANCHISEE is not obligated by this provision to allow PACIFIC PRIDE to inspect any books and/or records which do not pertain to the Franchise.

1719. FRANCHISEE shall submit to PACIFIC PRIDE the financial statements as required in this Agreement under Section 10.

1820. FRANCHISEE shall make any and all payments due to System Participants in a timely manner as required in this Agreement, particularly in Section 14,A and the Operations Manual. FRANCHISEE is required to make monies available in an account which PACIFIC PRIDE may access by electronic funds transfer to debit or credit FRANCHISEE for the net

of the operation of the Franchise, a crime involving moral turpitude, or other crime or offense that is likely to adversely affect the reputation of FRANCHISEE, its Sites, or other System Participants;

h.  Makes any unauthorized use or disclosure of the know-how or use, duplicates or discloses any portion of the Operations Manual in violation of this Agreement;

i.  Is adjudicated bankrupt or insolvent, if the termination is permitted by federal bankruptcy law (11 U.S.C. §101, et seq.);

j.  Makes an assignment for the benefit of creditors or similar disposition of the assets of the Franchise business;

k.  Makes an unauthorized assignment, sale, or transfer of the Franchise or FRANCHISEE'S Site or fails to assign the Franchise or the interest in the Franchise of a deceased or disabled principal owner thereof, as required by this Agreement;

l.  Conducts its Franchise in a manner which has a material adverse effect on the Marks; or

m.  Operates only one PACIFIC PRIDE Site and conducts its Franchise or FRANCHISEE'S Site in a manner which poses an immediate threat to health and safety.

3.  PACIFIC PRIDE shall have the right to terminate this Agreement effective without further notice after FRANCHISEE is given notice of a breach and fails to cure the breach within the specified time, if FRANCHISEE:

a.  Fails to make payments when due to PACIFIC PRIDE for any service fees or any other amounts due to PACIFIC PRIDE and/or other System Participants as detailed within this Agreement and the Operations Manual, and does not correct such failure within ten days after written notice of such failure is delivered to FRANCHISEE;

b.  Fails on two or more separate occasions within any period of twelve consecutive months to submit to PACIFIC PRIDE payments, reports or other data, information or supporting records when due, after receiving ten days written notice to cure the deficiency;

c.  Fails or refuses to comply with any mandatory specification, standard, or operating procedure prescribed by PACIFIC PRIDE relating to the cleanliness or sanitation of any one of FRANCHISEE'S Sites or violates any health, safety or sanitation law, ordinance or regulation and does not correct such failure or

e.   Surrenders or transfers control of the operation of any of FRANCHISEE'S PACIFIC PRIDE Sites within its Zip Code Area without prior approval from PACIFIC PRIDE;

f.   Commits and fails to promptly cure a default specifically related to a PACIFIC PRIDE Site within a Zip Code Area, under any provision of this Agreement after thirty days written notice to cure;

g.   Fails or refuses to comply with any mandatory specification, standard, or operating procedure prescribed by PACIFIC PRIDE relating to the cleanliness or sanitation of FRANCHISEE'S Sites within the Zip Code Area or violates any health, safety or sanitation law, ordinance or regulation within the Zip Code Area, and does not correct such failure or refusal within seventy-two hours after written notice thereof is delivered to FRANCHISEE;

h.   Makes an unauthorized assignment, sale, or transfer of any of the FRANCHISEE'S Sites within the Zip Code Area or fails to assign the interest in any of the Sites of a deceased or disabled principal owner thereof, as required by this Agreement; or

i.   Fails to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by PACIFIC PRIDE and does not correct such failure within thirty days after written notice of such failure to comply is delivered to FRANCHISEE. If the noncompliance is of such a nature that it cannot be completely cured within such thirty day period, PACIFIC PRIDE shall not terminate the Zip Code Area if FRANCHISEE commences correction within such period and thereafter proceeds in good faith and with reasonable diligence to effect compliance as soon as possible.

2.   If a Zip Code Area is terminated as part of the Territory of FRANCHISEE under this Agreement, all provisions of this Agreement shall remain in full force and effect for the remaining Territory of FRANCHISEE.

C.   Termination of Franchise Agreement by FRANCHISEE:

1.   FRANCHISEE may for any reason terminate its Franchise upon furnishing 180 days written notice to PACIFIC PRIDE of the termination and the effective date of the termination. If no effective date is given by Franchisee in the notice, the effective date shall be the 180th day following the receipt of the notice by PACIFIC PRIDE. PACIFIC PRIDE shall invalidate all PACIFIC PRIDE Access Cards issued by Franchisee on the effective date of termination.

and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of its Franchise and FRANCHISEE'S Sites.

D.        PACIFIC PRIDE shall not be responsible for any tax, including any Fuel or sales tax, or assessment related to the Franchise. _— negligent retention of control, etc., still applies_

## SECTION 27.  INDEPENDENT CONTRACTOR

FRANCHISEE is not an agent, legal representative, joint venturer, partner, employee, or servant of PACIFIC PRIDE for any purpose whatsoever.  FRANCHISEE is an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of PACIFIC PRIDE, or create any obligation, express or implied, on behalf of PACIFIC PRIDE. FRANCHISEE shall prominently display in its place of business a certificate stating that the business is independently owned and operated by FRANCHISEE as a FRANCHISEE of PACIFIC PRIDE, and not as an agent thereof.

## SECTION 28.  INDEMNIFICATION

A.        FRANCHISEE shall pay, defend, indemnify and hold harmless PACIFIC PRIDE and its officers, directors, and agents from all claims, demands, omissions, deaths, and liabilities arising directly or indirectly from, or related to, FRANCHISEE'S Franchise and other businesses (including without limitation the franchise portion of the business).following:

1.      the use by FRANCHISEE of PACIFIC PRIDE'S services or system, the standards or requirements set by PACIFIC PRIDE in this Agreement or the Operations Manual,

2.      the use of lost or stolen PACIFIC PRIDE Access Cards or Access Card numbers of FRANCHISEE'S Accounts

3.      the use of lost or stolen PACIFIC PRIDE Access Cards or numbers issued by other franchisees and used at FRANCHISEE'S Sites,

4.      disputed charges of any kind by FRANCHISEE'S Accounts, which charges were not caused by failure of the switch transaction by PACIFIC PRIDE'S central computer,

5.      failure of any communication systems that authorizes online transactions,

6.      use of additives in any Fuel dispensed from FRANCHISEE'S Sites or from Sites of System Participants by FRANCHISEE'S Accounts,

7.      FRANCHISEE'S blending of any Fuel, including without limitation any biodiesel fuel blends, dispensed from FRANCHISEE'S Sites or from Sites of System Participants for Fuel purchased by FRANCHISEE'S Accounts, and

Exhibit J-66

**EXHIBIT 6**

1  MARK L. WEBB, ESQ. (BAR NO. 067959)
   LAW OFFICES OF MARK L. WEBB
2  214 Grant Street, Suite 301
   San Francisco, CA 94108
3  Telephone: (415) 621-4500
   Facsimile: (415) 621-4173
4
   Attorneys for Plaintiff
5  DONALD WALKER

6
                IN THE UNITED STATES DISTRICT COURT
7
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
                        SAN FRANCISCO
9

10  DONALD WALKER,                        Case No. C 07-2857 SC

11         Plaintiff,                     **DECLARATION OF LEON
                                          GOTTLIEB IN OPPOSITION TO
12  v.                                    DEFENDANT'S MOTION FOR
                                          SUMMARY JUDGMENT**
13  PACIFIC PRIDE, a business entity, form
    unknown, et al.
14                                        Hearing Date:  November 2, 2007
           Defendants.                    Hearing Time:  10:00 a.m.
15                                        Courtroom:     1
                                          Trial date:    January 22, 2008
16

17

18       I, Leon Gottlieb, am making this declaration based upon my own personal knowledge

19  and if called upon to testify, I could and would testify competently thereto:

20       1.    I am currently, and for all relevant times set forth herein have been a United States

21  and International Franchise Consultant. I began consulting franchise in 1969. I have over 45

22  years of "hands-on" experience as an executive in a major franchise conglomerate and have been

23  retained in numerous franchise related consulting projects. Additionally, I have been retained on

24  numerous occasions to render expert testimony concerning franais systems and concepts, and

25  have qualified in court as an expert in franchise operations and franchise law. A current copy of

26  my Curriculum Vitae is attached hereto as Exhibit A.

27

28
     **DECLARATION OF LEON GOTTLIEB IN OPPOSITION TO DEFENDANT'S MOTION FOR
                              SUMMARY JUDGMENT**

2.      My initial experience began I 1960 during the original development of franchise sales, training, manuals, operations, and supervision of hundreds of International House of Pancakes (IHOP) Restaurants.  I was a director and vice president of national sales operations, real estate, site selection, equipment and construction for IHOP.  I assisted IHOP to become publicly traded on the New York Stock Exchange and further assisted at least 22 divisions of food-service, retail automotive and hospitality chains.

3.    During my tenure with IHOP's parent company, International Industries, Inc., it was my duty to instruct the numerous division executives to develop manuals and their particular franchise programs that followed our successful IHOP System.

4.    I commenced my own consulting firm in 1969 specializing in food service, hotels and franchising.  During the 20 years between 1968 and 1988, I enhanced and shared my knowledge of the Franchise industry by teaching about franchises at the University of California, Los Angeles for 20 years.  I have been a columnist in a nationally published business magazine focusing on the proper operation of franchises and I published "Gottlieb's Bottom Line" newsletter for 11 years which addressed issues related to operation of franchise businesses.  I have lectured extensively throughout the USA, Switzerland, Canada, Japan, Singapore, Korea, Aruba and even on a Carribean Cruise Ship regarding the various operations and requirements of franchise business operations.

5.    In preparation for making this declaration I have reviewed Plaintiff's Complaint, Defendant Pacific Pride, Inc.'s ("Pacific Pride") Answer; all of the depositions taken in this matter to date, the Pacific Pride Franchise Agreement; the Pacific Pride Operation Agreement; the Pacific Pride Offering Circular and Plaintiff's Motion for Summary

Judgment or Summary Adjudication.

6.    As set forth below, there are several areas wherein Pacific Pride exercises significant control over franchisee, San Francisco Petroleum.  Based on my experience, and my detailed review and analysis of the aforementioned documents in this case, the totality of the controls mandated by the Pacific Pride Offering Circular; the Pacific Pride Franchise Agreement and the Pacific Pride Operation Manual are such that San Francisco Petroleum is an agent for Pacific Petroleum, the principal.  Pacific Pride's "franchisees" are more comparable to commission sales agents than traditional franchisees.

7.    Pacific Pride, Inc., exercises control over San Francisco Petroleum by requiring their franchisees to purchase and display and maintain specific and approved Pacific Pride signage in order to operate a Pacific Pride, Inc., franchise.  See Exhibit B, a true and correct copy of the Franchise Agreement between Pacific Pride, Inc., and San Francisco Petroleum at page J-12, Section (6)(p); Exhibit C, a true and correct copy of Pacific Pride's Operating Manual loaned to San Francisco Petroleum, at pages PP0061 and PP0071.

8.    Pacific Pride, Inc., exercises control over San Francisco Petroleum by requiring written approval of the site location prior to allowing San Francisco Petroleum to operate the franchise.  Approval is at Pacific Pride's sole discretion.  Exhibit B at page J-9, Section 5, par. A and page J-23 par. 2; Exhibit C at pgs. PP0022-23.

9.    Pacific Pride exercises control over San Francisco Petroleum by mandating that San Francisco Petroleum provide, among other things:

"1.  Dedicated Pacific Pride island for gasoline.  A dedicated island is not a stand-alone Multiple Product Dispenser (MPD).  Both sides of the dedicated island and the lanes

1

2

accessing them must be dedicated to Pacific Pride customers only.  A single MPD or

3

other dispensers in line with retail dispensers will not be allowed.

4

2.  Site must be open 24 hours a day, 365 days a year.

5

3.  Product prices not posted.

6

4.  Air and water provided at no cost to Pacific Pride customers.

7

5.  Safe and well lit.

8

9

6.  Minimum of 10,000 square feet ..." [Emphasis added]

10

See Exhibit C at page PP0060.

11

10.    Pacific Pride, exercises control over San Francisco Petroleum by requiring San Francisco

12

Petroleum to maintain the physical condition and appearance of its site as set forth in

13

Pacific Pride, Inc.'s Operations Manual.  The safety provisions set forth in Pacific Pride's

14

Operation Manual may be changed at Pacific Pride's discretion.  (See Exhibit B at page J-

15

27, Section 14, pars. (D)(5) and (6); Exhibit B at page 37, Section 19, (A)(1)(f); see also

16

17

Exhibit C, at page PP0022-23 J-39, par. 17.)

18

11.    Pacific Pride's Operation Manual specifically addresses issues regarding Site

19

Maintenance, Fuel Spills, Card Reader Maintenance, Volume and Checks, Annual

20

Inspection Reports and Incident Report Procedures.  Exhibit C, Chapter 9.

21

12.    The Pacific Pride Operation Manual clearly states that:

22

"The standards and specifications have not been arbitrarily set.  They are intended to

23

ensure safe, clean sites in proper working condition for all Pacific Pride customers."
[Emphasis added]

24

Exhibit C at PP00011.  See also Exhibit B at page J-27, Sect. 14 (D)(5)(6); and page J-37, Sect.

25

19 (A)(1)(f).

26

27

13.    Pacific Pride exercises substantial control over San Francisco Petroleum by reserving the

28

4

1

2

3    right to change San Francisco Petroleum's product supply requirements and product

4    specifications at Pacific Pride's own discretion.  See Exhibit B at page J-26, Section D,

5    par. 2.

6    14.    Pacific Pride, Inc., requires the Franchisee to allow inspections of the site to ensure

7        compliance.  (See Exhibit B, page J-12, par. Q)

8    15.    Pacific Pride, Inc., exercises control over San Francisco Petroleum by requiring the

9        training of San Francisco Petroleum's employees.  (See Exhibit B, page J-23 at par. 8;

10       Exhibit C, pg. J-38, par. 13.)

11

12   16.    Pacific Pride, Inc., exercises control over San Francisco Petroleum by requiring the

13       franchisee to offer and maintain a minimum of three grades of fuel for purchase by

14       Pacific Pride, Inc., customers. See Exhibit B, pg. J-26, Section D., 2; Exhibit C at pgs.

15       PP0035, PP0060-61.  Additionally, Pacific Pride sets forth quality standards for the fuel

16       sold by San Francisco Petroleum.  Exhibit C at pg. PP0095.

17   17.    Pacific Pride compels its franchisees to "winterize" their diesel fuel in areas where the

18       temperature is consistently below 5 degrees Fahrenheit.  See Exhibit B at pg. J-27, par 4;

19       Exhibit C at pgs. PP0096-0097.

20

21   18.    Pacific Pride exercises substantial control over San Francisco Petroleum by requiring San

22       Francisco Petroleum to purchase and implement Pacific Petroleum's fueling hardware

23       and software equipment.  The software provides to Pacific Pride the daily fuel purchases

24       in real time.  Exhibit B, page J-17 at par. 4.  Consequently, Pacific Pride has complete

25       control of all gross receipts and distribution of commissions (i.e. PROFITS) of their

26       franchisee-agents, including San Francisco Petroleum.

27

28

1

2

19.    Pacific Pride, Inc., exercises control over San Francisco Petroleum by requiring San

3

Francisco Petroleum to create a joint bank account which Pacific Pride is a named joint

4

account holder by which Pacific Pride may make withdrawals and deposits.  See Exhibit

5

B at page J-26, Section C, par. 6 and Exhibit C at page PP0027, Section 7.

6

20.    Pacific Pride has unfettered access to draw on the joint account with San Francisco

7

Petroleum twice per month to recover the franchise fees, advertising fees and for the

8

numerous ancillary fees San Francisco Petroleum is required to pay.  Exhibit B at pgs. J-

9

18 through J-20; Exhibit C.

10

11

21.    Pacific Pride controls the inter-company transfer deposits into each of the Franchisees

12

accounts through the use of Pacific Pride's "Controller" software and the mandated joint

13

account which San Francisco Petroleum was compelled to create pursuant to the

14

provisions of the franchise agreement.

15

16

22.    The amount charged to San Francisco Petroleum for advertising is in Pacific Pride's sole

17

discretion which is withdrawn from the aforementioned joint account between Pacific

18

Pride and San Francisco Petroleum.  Exhibit B at pages J-13 through J-14.

19

20

23.    The Franchise Agreement requires that San Francisco Petroleum acquire insurance for the

21

franchise and Pacific Pride, Inc., as an additional insured on the policy.  See Exhibit B at

22

page J-25, Section C, par 4; Exhibit C at page PP0026-0027, Section 6.

23

24.    Pacific Pride contends in their papers that they are merely a financial services provider.

24

However, the franchise agreement and operations manual wholly contradict this

25

contention by providing for numerous requirements, many of which are set forth herein,

26

27

in their franchise agreement completely inconsistent with a mere financial services

28

1
2
3      provider.  Pacific Pride's Operating Manual clearly states that Pacific Pride does NOT

4      believe the Pacific Pride card is a credit card.  Exhibit C at page PP00182.  In fact, Pacific

5      Pride cautions their franchisees that "[i]t is important to never refer to the Pacific Pride

6      access card as anything other than an access card."

7   25.   Pacific Pride has the power to terminate a franchisee, for among several other reasons, if

8      the franchisee:

9      "Fails to comply with any other provision of this Agreement or any mandatory
10     specification, standard or operating procedure prescribed by PACIFIC PRIDE and does
       not correct such failure within thirty days after written notice of such failure to comply is
11     delivered to FRANCHISEE.  If the noncompliance is of such a nature that it cannot be
       completely cured within such thirty day period, PACIFIC PRIDE shall not terminate the
12     Franchise IF FRANCHISEE commences correction within such period and thereafter
       proceeds in good faith and with reasonable diligence to effect compliance as soon as
13     possible."  Exhibit B, pg. J-37, Sect. 19, par. h.

14

15  26.   It is well below the industry standard for a franchisor to avoid the responsibility of

16     determining whether the franchisee is in compliance with the franchise agreement by

17     simply refusing to take any affirmative steps to determine whether the franchise is in

18     compliance with the agreement.  Where a franchisor sets forth requirements for the

19     franchisee to adhere to, it is the industry standard that the franchisor has an obligation to

20     inspect or objectively determine that the requirements set forth by the franchisor are being

21     met.  Exhibit D, true and correct excerpts from the Deposition of Cynthia Rose Condon,

22     Vice president of Pacific Pride, Inc., page 15, lns. 14-22, p. 142, ln. ln.24, 25, pg. 143,

23     ln.1-4.  It is also my opinion, that, it is incumbent upon a franchisor to put in place an

24     adequate set of uniform safety precautions so that each franchise will have the benefit of

25     the franchisor's superior knowledge and experience to assure greater safety and security

26

27

28

1

2

3   in the workplace.

4   27.   As set forth above, Pacific Pride imposes several requirements regarding the

5   maintenance, lighting and safety of its Pacific Pride sites. However, they do nothing to

6   insure that the Franchisee is in fact, abiding by the requirements set forth in the Franchise

7   Agreement or Operations Manual. Exhibit D, true and correct excerpts from the

8   Deposition of Cynthia Rose Condon, Vice President of Pacific Pride, Inc., page 10, lns. 8-

9   25, pg. 11, lns 2-8. In light of the dangers presented with the petroleum business and the

10   requirements of the Franchise Agreement and Operations Manual, Pacific Pride's failure

11   to inspect the premises of San Francisco Petroleum is below the industry standard.

12

13   28.   Based on my extensive experience and understanding of Franchisor-Franchisee practices,

14   the relationship between Pacific Pride, Inc., and San Francisco Petroleum is a Principal-

15   Agent relationship because of the substantial control provided to Pacific Pride, Inc., by

16   virtue of the Franchise Agreement and Operation Manual and automated software control

17   over San Francisco Petroleum's banking, accounting, site-possession, site-location,

18   training, product sales, and power of termination as set forth in the Franchisee Agreement

19   between Pacific Petroleum, Inc., and San Francisco Petroleum and as directed by the

20   Operation Manual provided by Pacific Petroleum, Inc., to San Francisco Petroleum.

21   I declare under penalty of perjury under the laws of the State of California that all of the

22   foregoing is true and correct except as to those matters which are stated upon information and

23   belief, and as to those matters I believe them to be true.

24

25   Executed this 8th day of October, 2007 at _Los Angeles_, California.

26

27

28

5



1
2
3
By: _____
·4                    LEON GOTTLIEB
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9

Management & Profit effectiveness: All types restaurants, fast foods, hotels, franchises, food courts, bars, liquor liability, convenience marts, standard operating procedures, safety, security, research, advertising, marketing, frozen foods manufacturing, distribution, franchisor-franchisee disputes, site selection, evaluations, appraisals, damages, expert witness testimony

# Leon Gottlieb...USA-Int'l Restaurant, Hotel & Franchise Consultant

### 4601 Sendero Place, Tarzana, CA 91356-4821 USA

Tel: 818-757-1131        Fax: 818-757-1816        e-mail: lgottlieb@aol.com

## CURRICULUM VITAE

A brief profile...Established 1969, Leon Gottlieb offers specialized expert & consultation services to clients in the USA and internationally.

### Hands-on experience:

-Owner-operator, 210 seat full-service restaurant.
-Partner, Vice President, National Franchise & Restaurant Operations IHOP,
        Responsibilities included: Director, Sites, Construction & Equipment
        International House of Pancakes Restaurant Chain...1960-1969
-President, Copper Penny Family Restaurant Chain...24-hour concept
-Sales Manager, Kermin Frozen Foods Company...1951-1959
-Advertising Sales, Los Angeles Times...1949-1951
-Advertising & Production: L.A. Reporter & Guest Informant Hotel Mag.
-U.S. Navy Ship's Cook, World War II...1945-1946

-Mr. Gottlieb's expertise and responsibilities enabled IHOP to go-public on the N.Y. Stock Exchange. His direct involvement in the 22-division franchise conglomerate included franchise/fee agreements,  restaurant, bars, hotel & franchise standard operating procedures, training, manuals, liquor liability, personal injury, safety, security, site selection, advertising, P&L evaluations, restaurant appraisals...with volume in excess of $150 million employing thousands, licensing over 1,200 franchisees worldwide...and continuing as an industry consultant since 1969 to date.

### Memberships & Research Sources:

            -National Restaurant Association
            -California Restaurant Association
            -The American Hotel/Lodging Association
            -Certified ServSafe--National Restaurant Association's
                Food Safety Program
            -World Intellectual Property Organization (WIPO)

Page 2

**Officer, Director, Partner, Stockholder:**

-Mr. Gottlieb has held positions of authority, responsibility, ownership, officer and/or directorships with such diverse organizations as:

-IHOP, International House of Pancakes
-Pioneer Take Out Corporation
-Kermin Frozen Foods Company
-Accountant's Overload, Inc.
-Royal Inns of America, Inc.
-Betsy Ross Ice Cream/Coffee Shops
-Fresh & Ready Foods, Inc.

-Bobby McGee's Conglomeration
-Kaboby-Mexican Dan's, Inc.
-China Grove Restaurants, Inc.
-IBM Foods, Inc.
-Numero Uno Franchise Corp.
-Copper Penny Family Restaurants
-Franchise Consult-Group, China

**Education, Honors, Associations, Volunteer Activities:**

-Graduate, Sawyer Business College (Certificate), 1949, L.A., CA
-Instructor: Restaurant Operations, Franchising, Advertising/Promotions
        UCLA & L.A. Community Colleges (26 yrs)
-Action & Truth in Menu Committees: National & California Rest. Assns
-President, Frozen Food Council of California; Who's Who in America
-Certified: ServSafe National Restaurant Assn Food Safety Program
-Volunteer Executive: Int'l Executive Service Corps (IESC) and
        Citizens for Democracy Corps (CDC) in Egypt, Latvia, Poland

**Publications, Columnist, Author Credits:**

-Columnist: Restaurant Business Magazine, N.Y. (20 yrs), Singapore Hotel
        & Restaurant Magazine, Hotelier for Asia, La Carta Spanish Pub.
        Modern Franchise Journal, Western Foodservice, Restaurant News,
        Quick Frozen Foods Mag., L.A. Reporter, Eastside Journal
-Editor/Publisher: "Gottlieb's Bottom Line" Newsletter (11 yrs)
-Author:    "The People Factor", Bill Communications, N.Y.
        "The Best of Gottlieb's Bottom Line", Lebhar-Friedman, N.Y.
        "Foodservice/Hospitality Advertising & Promotion",
                Bobbs-Merrill Educational Publishing, Indiana
        "My Golf Handicap is My Husband" (self-published)

Page 3

**Consultant, Lecturer, Seminar Panelist & Clients:**

The following is a partial list showing the wide variety of Mr. Gottlieb's domestic clients, events, consulting and expert witness assignments:

-Big Boy Restaurants (Marriott)
-Royal Inns of America (Hotels)
-National Restaurant Assn
-Del Webb's Newport Golf Resort
-Holiday Inns of America
-Subway Sandwich Corp.
-Hot Dog on a Stick, Inc.
-Wil Wright's Ice Cream, Inc.
-Callaway Gardens Golf Resort
-Ameci In & Out Pizza, Inc.
-El Torito Mexican Restaurants
-Sizzler Restaurants, Inc.
-Betsy Ross Ice Cream Shoppes
-Woody's Smorgasburger
-Orange Julius, Inc.
-United Rent-All Equipment
-Accountant's Overload, Inc.
-House of Nine Ladies Wear
-Convenient Marts
-North American Pizza Assn
-Kaboby-Mexican Dan's Corp.
-Pioneer Take Out Corp.
-Santa Anita Race Track
-Bobby McGee's Conglomeration
-Mrs. Fields Cookies/Bakeries
-Sybra/Arby's Fast Foods
-Michael's Artist Supplies
-Fresh & Ready Foods, Inc.
-Al & Ed's AutoSound, Inc.
-Hyatt Regency Hotel
-Century Plaza Hotel
-BankAmerica, Inc.
-Thomas Kinkade Art Galleries

-IHOP, International House of Pancakes
-California Restaurant Assn
-Oregon/Washington Rest. Assn
-Canadian Restaurant Assn
-Pizza Inns, Inc.
-Der Wienerschnitzel Corp.
-MUFSO, Nation's Restaurant News
-Marcus BBQ & Steak House
-Cafe 50's Diners
-Castle Garden Buffets, Inc.
-Diet Stores/Slender Spoon, Inc.
-House of Pies (Bakeries)
-Pacific Fish Broiler
-Big Brake/Tune Up Shops
-Bryman/Sawyer Schools, Inc.
-Tiny Naylor's Restaurants, Inc.
-The Dog House/fast food restaurants
-Golden Bird Restaurants
-Turkey Basket Restaurants
-China Grove Restaurants (malls)
-Numero Uno Franchise Corp.
-Better People Network, Inc.
-Brookside Golf Course, Pasadena, CA
-Craig's Olympia Oyster House, WA
-Country Kitchens of Colorado
-The Warehouse Marina Restauants
-McDonald's
-Jack in the Box/Foodmaker, Inc.
-Taco Bell...Del Taco
-Howard Johnson's Hotel
-Holiday Inn Express Hotel
-Tony Roma's BBQ/Damon's Bar/Grill
-Darden Corp. Olive Garden Rest.

Page 4

**International Clients:**

The following are examples of extensive and varied client, consulting and lecturing assignments in foreign countries:

-Tokyo, Japan: Consulting in fast food, coffee shop, dinner houses, retail, food products, manufacturing/central kitchen/distribution and franchise operations...Fujiya Confectionary Co., Ltd (8 yrs)
-Tokyo, Japan: MOS Corporation, fast food & specialty restaurants
-Tokyo, Japan: C. Itoh Trading Company...Japan, Canada & USA
-Hokkaido, Japan: Tonden Sushi Restaurants & retail...Japan & USA
-Singapore: Consultant, Lecturer, Columnist, Singapore Hotel/Rest. Assn
-Panama Canal Cruise: Seminars, Caribbean Hotel & Calif. Rest. Assn
-Aruba, Caribbean Hotel Association
-Quebec, Canada: Consultant, Popeye Fast Foods Corp.
-Zurich, Switzerland: Lecturer, Int'l Franchise Congress Convention
-Alexandria, Cairo, Egypt: Consultant, Nesmahar Company
-Balvi, Riga, Latvia: Consultant, Municipal Foodservice Enterprises
-Katowice, Poland: Consultant, Mr. Hamburger Franchise Corp.
-Seoul, Korea: Consultant, Kukje Pacific Corp.
-Kuala Lumpur, Malaysia: Consultant, MBF Holding BHD, Ltd, multi-area foodservice/hotel franchisee
-Beijing, China: Associate/Franchise Consultant, C&M Law Offices

**Arbitrator:**

-American Arbitration Association (1972-2000)
-Superior/Municipal Courts, Los Angeles, Beverly Hills, Santa Monica
-The California State Bar--Fee Dispute Resolution
-World Intellectual Property Organization (WIPO), Geneva, Switzerl'd
-Korean Commercial Arbitration Board, Seoul, Korea

CV Addendums: Hotel/Motel Experience...Summary of Depositions/Trials and Fee Schedule...available upon request

**EXHIBIT 7**

```
                              depo of falche.02.15.07
00001
  1                 SUPERIOR COURT OF THE STATE OF CALIFORNIA
  2                  IN AND FOR THE COUNTY OF SAN FRANCISCO
  3                       UNLIMITED CIVIL JURISDICTION
  4                              --oOo--
  5
  6     DONALD WALKER, an individual,
  7           Plaintiff,
  8        vs.                              No. CGC 06-456176
  9     PACIFIC PRIDE, a business entity,
        form unknown, RICHARD K. POOLER,
 10     an individual, and DOES 1 through
        50, inclusive,
 11
 12           Defendants.

 13     _____/
 14
 15                          DEPOSITION OF
 16                          ROBERT FALCHE
 17                   THURSDAY, FEBRUARY 15, 2007
 18
 19
 20     Reported By:  LELAND BATARA, CSR NO. 3759
 21     _____
 22
 23                          Tooker & Antz
                    Court Reporting and Video Services
 24                  350 Sansome Street, Suite 700
                     San Francisco, California 94104
 25                  415-392-0650 Fax 415-392-3897

00002
  1                              --oOo--
  2                            APPEARANCES
  3           LAW OFFICES OF MARK L. WEBB, 414 Gough Street,
  4     Suite Two, San Francisco, California 94102, by MARK L. WEBB,
  5     Attorney at Law, appeared as counsel on behalf of the
  6     Plaintiff Donald Walker.
  7           LAW OFFICES OF WRIGHT, ROBINSON, OSTHIMER & TATUM,
  8     44 Montgomery Street, 18th Floor, San Francisco, California
  9     94104-4705, represented by BRADLEY D. FELL, Attorney at Law,
 10     appeared as counsel on behalf of the Defendant Pacific Pride.
 11           LAW OFFICES OF ROBBINS, FETTNER & LemMON, 436
 12     14th Street, Suite 405, Oakland, California 94612, by JEFFREY
 13     I. FETTNER, Attorney at Law, appeared as counsel on behalf
 14     of the Defendant San Francisco Petroleum.
 15                              --oOo--
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25

00003
  1                            I N D E X
  2     EXAMINATION BY:                              PAGE
```

00021
1       Q.   How many employees are there at Liberty
2   Constellation?
3       A.   None.
4       Q.   Is it a corporation?
5       A.   Yes.
6       Q.   California?
7       A.   Yes.
8       Q.   How long have you been the president of it?
9       A.   Since its inception.
10      Q.   And that is about when, approximately?
11      A.   Three to four years.  No, it must be more like five
12  or six years.
13      Q.   Okay.  And it has nothing to do with gasoline, but
14  it holds real property; is that right?
15      A.   It owns the real property on which one of the

                            depo of falche.02.15.07
16  fueling cardlocks is on.
17      Q.   What does that mean, if I may ask?
18      MR. FETTNER:  You mean a fueling cardlock?
19  BY MR. WEBB:
20      Q.   I know what you mean.  One of the eleven stations?
21      A.   That's correct.
22      Q.   Now, does it own 2121 Third Street?
23      A.   No.
24      Q.   Do you have any interest financially in 2121 Third
25  Street other than being a lessee, let's say?
0
00022

U
00042
1   just sort of like selling it and having people deliver it, or
2   how does it work, that one?
3        A.  Cal Northern would see the retail gas station, get
4   them to purchase product from them at a price and sell it to
5   them.
6            MR. WEBB:  Could you read that back.
7            (Answer read.)
8   BY MR. WEBB:
9        Q.  So would this be like brand names?
10       A.  No, unbranded.  Unbranded gasoline.
11       Q.  And where did the gasoline come from that you
12  acquired to sell to these companies?
13       A.  It was sold by San Francisco Petroleum to Cal
14  Northern.
15       Q.  Okay.  So S.F. Petroleum would acquire it, and then
                         Page 18

16  S.F. Petroleum, presumably, would make a profit and sell it
17  to Cal Northern?
18       A.  Yes.
19       Q.  All right.  And this one, you were the owner.
20           Anybody else associated with this one, like Richard
21  Pooler?
22       A.  No.  The only other party there was Douglas Seams.
23       Q.  So, I mean, it sounds like S.F. Petroleum is the
24  one that really physically acquired this actual product, the
25  gasoline, and delivered it.  And then Cal Northern would

00043
1  perhaps make the arrangements to sell it to third parties as
2  unbranded gasoline.  And that's why there were two companies,
3  because you used one company to sell it and the other company
4  to purchase it.  And that company that purchased it was S.F.
5  Petroleum, who sold it to Cal Northern, and Cal Northern had
6  some customers that it, in turn, sold the product to.  Is
7  that a good summary?
8       A.  No.  The reason there were two companies was
9  because Cal Northern was founded before -- excuse me.  There
10 was one other owner-in there.  John Santana.  It was founded
11 before we purchased San Francisco Petroleum.
12      Q.  Okay.  But I mean the function of it, did I
13 describe the function accurately?
14      A.  No.  The reason it existed was because John Santana
15 and I wanted to get into the fuel delivery business with
16 Mr. Seams prior to our ownership of San Francisco Petroleum.
17           Subsequent to buying San Francisco Petroleum, we
18 didn't want to lose the experience of Mr. Seams, and so we
19 kept it operating, but doing its purchases through San
20 Francisco Petroleum.
21      Q.  Okay.  I guess that's about as much as I am going
22 to understand.  But thank you for that answer.
23           So how long were you in business together with John
24 Santana?
25      A.  In this business, or which one?

```
00044
 1        Q.   Any business.
 2        A.   I told you earlier that I was in business with him
 3    in International Marine Fuels of San Francisco.
 4        Q.   Which is 19 --
 5        A.   About 1994, I think that ended.
 6        Q.   Right.  And it was '82 that it started?
 7        A.   Right.
 8        Q.   With you, anyway.
 9        A.   And he was a part owner in Pacific Commercial
10    Fueling until his death.
11        Q.   Okay.
12        A.   And now his wife is an owner.
13        Q.   Okay.
14        A.   And we were in Cal Northern Petroleum together
15    until about the same 1994 time period.
16        Q.   And what about his role at International Marine
17    Fuels Group, what was his status there?
18        A.   He took -- after 1994, he didn't own any interest.
19    We split our interest.
20        Q.   Okay.  But until 1994, did he own a piece of it?
21        A.   Yes.
22        Q.   He was the owner; right?
23        A.   No.
24        Q.   He was a part owner with you?
                                    Page 19
```

00046
1       Q.   Okay.  And then up until 1990, I have it that you
2   practiced law as well.
3       A.   Yes.
4       Q.   And then 1990 is also the time that you purchased
5   S.F. Petroleum, or at least part of it; right?
6       A.   That's correct.
7       Q.   And also from '90 to '94, you were in S.F.
8   Petroleum with Mr. Santana; right?
9       A.   That's correct.
10      Q.   And Mr. Pooler, too?
11      A.   No.
12      Q.   Okay.  Just Mr. Santana.  Just the two of you?
13      A.   Yes.
14      Q.   From '90 to '94, what was your respective titles at
15   S.F. Petroleum?
16      A.   I was the president.
17      Q.   Okay.
18      A.   And Mr. Santana was vice president.
19      Q.   So would you say that of all the businesses we have
20   talked about so far at 2121 Third Street, it sounds like S.F.
21   Petroleum is the largest in terms of, you know, having the
22   most employees.
23      A.   Yes.
24      Q.   The others were other businesses, but the majority
25   of the people who worked at this site were S.F. Petroleum

00047
1  employees; right?
2      A.  That's correct.
3      Q.  Okay.  So what was your role and what was
4  Mr. Santana's role, let's say, during the '90 to '94 period
5  while he and you were president and vice president?
6      A.  Well, he pretty much ran International Marine Fuels

Page 20

7  of San Francisco, and I ran International Marine Fuels Group.
8      Q.  But you still were co-president.  You were
9  co-officers of San Francisco Petroleum for four years; right?
10     A.  Yes.
11     Q.  And together, you must have --
12     A.  We discussed --
13     Q.  -- collaborated in some way; right?
14     A.  Yes.  We discussed the business and things that
15 would be done with the business, but the day-to-day
16 operation, I wouldn't be involved in his day-to-day
17 operation, and he wouldn't be involved in my day-to-day
18 operation.
19         MR. WEBB:  Make this Exhibit 4.
20         (Exhibit 4 marked for identification.)
21 BY MR. WEBB:
22     Q.  This is an Internet printout of Pacific Commercial
23 Fueling.  I will just ask you if you can recognize that that
24 is the same company we have been talking about.
25     A.  The name is, yes.

depo of falche.02.15.07

00057
1           MR. FETTNER:  You mean any type of training at all?
2           MR. WEBB:  Yes.
3           MR. FETTNER:  All right.
4           MR. WEBB:  I mean, I am just trying to get a sense
5    of whether there are physical documents.
6           MR. FETTNER:  Code specific prior to him coming.  I
7    understand.
8           MR. FELL:  Vague and ambiguous.
9           THE WITNESS:  They have a computer system that we
10   use.  They had the instructions for the use of that computer
11   system that is probably, I don't know, volumes of books that
12   they changed in the course of the last 16 years, or whatever.
13   BY MR. WEBB:
14       Q.  And what is the nature of what they train you
15   about?
16       A.  How to use the computer system.
17       Q.  All right.  How about manuals for operation of the
18   station, do they include those?
19       A.  Not that I am aware of.
20       Q.  They have an operation manual.  They call it an
21   operation manual.
22           Did you ever get a copy of their operation manual?
23       A.  Yes.
24       Q.  Do you have --
25       A.  That is for the computer system.

00058
1    Q.  Do you have it in your facility?
2    A.  Yes.
3    Q.  Have you looked at it recently?
4    A.  No.
5    Q.  By the way, have you looked at any documents to
6  prepare for this deposition?
7    A.  No.
8    Q.  The operations manual, does it have anything in it
9  about the operation of the facility in the sense of delivery
10 of fuel or, you know, anything like that?
11   A.  As far as I am aware of, no.  I have only looked at
12 the computer -- the computer systems, how to use those.
13   Q.  At some point, did you actually read the operations
14 manual?
15   A.  No.
16   Q.  Okay.  If I told you, and I will represent to you
17 on the record that counsel's associate was there and
18 furnished me with a page of the operation manual that
19 addresses the issue of fuel spills, would that help you to
20 remember as to whether or not there was a section in the
21 manual that talks about what to do if there is a fuel spill?
22   A.  No.
23   Q.  Did you know that Pacific Pride directed itself as
24 to what to do in the event of fuel spills at the site?
                                    Page 25

7.

depo of falrbe.02.15.07

```
0
00071
 1        A.  Because we have a lubricant business.  We sell
 2   lubricants, and lubricants come in pallets, and they also
 3   come in drums, and the forklift is necessary to move the
 4   lubricants.
 5        Q.  So would you say that -- how do lubricants, they
 6   come in pallets?
 7        A.  They come in pallets, and they come in case goods
 8   that are mounted on pallets, or cases that are mounted on
 9   pallets, or five-gallon pails that are mounted on pallets, or
10   drums that are mounted on pallets.
11        So the forklift is necessary to move the pallets,
12   and it is also necessary when you are moving a drum to take
13   it to a customer, to deliver it, to put it on the vehicle to
14   deliver it.
15        Q.  From your experience, in terms of all the
16   different, you know, gasoline distribution businesses that
17   you have either been involved with or visited or known, this
18   isn't the only company that uses a forklift, is it?
19        A.  In the fuel distribution business, it is not
20   necessary to have a forklift.  We have the seven locations in
21   Los Angeles, we do not have a single forklift.  We have the
22   four locations that we have up north.  We only have a
23   forklift at this location, and that is because we have our
24   drums and lubricants at that location.  But you can operate
25   the fueling business without a forklift.
0
00072
```

depo of falche.02.15.07

00080
1      A.  I don't know.
2      Q.  All right.  And then the cards, I guess, when you
3   use a card, if you are a customer, you put it into the
4   cardlock system and then -- it's like a credit card; right?
5   You just sort of like take what you want and then you get
6   billed kind of thing?
7      A.  You put it into the card reader which activates the
8   pumps.  The customer then -- Pacific Pride each night
9   transmits us the information as to how much was used by that
10  card and what locations.  We transfer it to our billing
11  computer, and we bill the customer.
12     Q.  Oh, okay.  And does Pacific Pride keep track of how
13  many gallons you sell at each site?
14     A.  Its computers do.
15     Q.  Sure.  Well, that's it; right?  I mean, Pacific
16  Pride and its computers keep track of that kind of stuff;
17  right?
18     A.  Yes.
19     Q.  And do they take a percentage of royalties based on
20  the amount of gasoline you sell?
21     A.  They have a fee that is based on every time the
22  card is used, and then I believe they have some other charges
23  based on -- I don't know specifically what all the charges
24  are.  I don't recall them off the top of my head.
25     Q.  Okay.  Well, they have some elaborate system, and

00081

depo of falche.02.15.07

00081
1   we will look at it in a minute, in terms of how they charge.
2   For the use of each card, there is a transaction; right?
3        A.  Yes.
4        Q.  And also a certain percentage of whatever you sell,
5   certain types of gasoline; right?  They take a piece of that
6   action, depending on --
7        A.  Yes, they take some amount.  I don't know if it's
8   on the volume or just on the use, the fact that it's
9   activated.
10       Q.  Let's continue to look at Exhibit No. 6.  Then it
11  says -- there is a bullet point series there.  Do you see
12  that, in the middle of the page?
13       A.  Yes.
14       Q.  It says, "24-hour access to over 1,000 fueling
15  stations."
16           Okay.  Did you know there were over 1,000 fueling
17  stations?
18       A.  I thought there was more.
19       Q.  How many did you think?
20       A.  About 1,400 or something.
21       Q.  And then it says, "Open to commercial vehicles
22  only."
23           And did you know that?
24       A.  Yes.
25       Q.  It says, "Top quality fuel and lubricants."

00082

```
0
00082
 1            Did you know that?
 2       A.  Yes.
 3       Q.  Now, when it comes to top quality fuel and
 4  lubricants, what, if anything, does Pacific Pride do to make
 5  sure that its franchisees, including yourself, sell only the
 6  top quality fuel and lubricants?


                          depo of falche.02.15.07
 7       A.  They don't do anything because the government
 8  dictates what fuel can be sold.
 9       Q.  Okay.  Does Pacific Pride have any requirements or
10  conditions toward you as to what you can and can't sell at
11  your sites?
12       A.  I think they require that we do business within the
13  law, and the law requires that you have to sell fuel that
14  meets the requirements of the EPA or the California Air
15  Resources Board.
16       Q.  Okay.  Other than telling you that you have to
17  follow the law, do they have any checks or investigations
18  that you are aware of to make sure that you are following the
19  law with respect to the sale of quality fuel and lubricants?
20       A.  Not that I am aware of.
21       Q.  They kind of leave it up to you; right?
22       A.  Yes.
23       Q.  Okay.  And I --
24       A.  We are the actual seller.
25       Q.  I get it.  And I spoke to a woman up there by the
0
00083
```

00103
1       A.   No.
2       Q.   Nothing concrete?
3       A.   No.
4       Q.   All right.  Now, we go to question 6 on this.  This
5   is, by the way, an application for approval of a franchise.
6   You can see that; right?

                            depo of falche.02.15.07
7       A.   Yes.
8       Q.   Have you ever had to fill out one of these?
9       A.   I'm not sure.
10      Q.   Did you ever fill it out for the L.A. sites because
11  you --
12      A.   They were pre-existing sites.  So we filled out
13  something to take them over, but I don't know if it was this
14  particular item or not.
15      Q.   Okay.   They were pre-existing Pacific Pride sites?
16      A.   Yes.
17      Q.   I see.  Okay.  So they were already Pacific Pride
18  sites, and then you purchased them or acquired them and, as
19  far as you can remember, you didn't have to go through
20  another application process?
21      A.   That's correct.
22      Q.   So then question 6, it says, "Does this site have a
23  dedicated Pacific Pride island."
24           Do you see that?
25      A.   Yes.
00104

depo of falche.02.15.07

0
00104
1        Q.  Does the one in San Francisco have such an island?
2        A.  All the islands are Pacific Pride islands.  There
3   is no other --
4        Q.  Got it.  Okay.  You can turn the page now, if you
5   would.  And then question 9 says, "Is the site branded?"
6            MR. FETTNER:  We don't have the numbers.  Are you
7   talking about -- okay.  Got it.
8            MR. WEBB:  It's cut off.  Bad copying.
9            MR. FETTNER:  That's all right.
10           THE WITNESS:  It's unbranded.
11  BY MR. WEBB:
12       Q.  All of it is unbranded?
13       A.  Yes.
14       Q.  And that is of no consequence, at least in terms of
15  the franchise agreement to Pacific Pride.  They don't really
16  care if it's branded or unbranded; right?
17       A.  That's correct, as far as I know.
18       Q.  Okay.  Now, let's go to the next page.  No. 18, it
19  says, "Please give the dimensions of the property."
20           Is that something you have ever furnished with
21  respect to the Third Street site?
22       A.  I don't know.
23       Q.  How about 19, "Does the site meet all governmental
24  and regulatory requirements?"
25           Is that something you have ever answered, as far as
0
00105

00135
1      A.   It says right there, "The operations manual does
2  not contain standards on how to manage and operate commercial
3  automated fueling sites, which is the sole responsibility of
4  franchisee."
5      Q.   I see that.  And it also has in the index about
6  what to do with fuel spills.  So I guess that's a point that
7  is open to discussion, in any case.  In fact, now that you
8  raise it, let's look at the index one more time, the index of
9  the operations manual.
10         Jeffrey, can you help me out?
11         MR. FETTNER:  I was trying to find out where that
12  was.
13         MR. WEBB:  Oh, I got it.  It's way back here, about
14  one-third in.  It's Exhibit C.
15         MR. FETTNER:  Got it.
16  BY MR. WEBB:
17     Q.   If you look at Exhibit C, page 1, Table of
18  Contents.
19     A.   Yes.
20     Q.   First off, it says in Chapter 2, Section 4,
21  "Government Rules and Regulations."
22         Do you see that?
23     A.   Yes.
24     Q.   And I don't know what it says because I don't have
                                Page 58

                           depo of falche.02.15.07
25  the manual, but would it be fair to assume that they want you

00136
1   to comply with government rules and regulations in the
2   running of this franchise?
3           A.  I don't know.
4               MR. FELL:  Calls for speculation.
5   BY MR. WEBB:
6           Q.  Yes.  I mean, I don't want you to guess, but if you
7   know.
8           A.  I don't know.
9           Q.  Okay.  Then in Chapter 3, and that's under Site
10  Preparation, do you see Section 9?  It says, "Pacific Pride's
11  site requirements."
12              Do you see that?
13          A.  Yes.
14          Q.  And you know that Pacific Pride has the right to
15  approve or disapprove of the site location, don't you?
16          A.  When you initially apply, yes.
17          Q.  Okay.  And then on the next page, Chapter 5, it
18  talks about quality standards for products.
19              Do you see that?
20          A.  Yes.
21          Q.  Apparently, they have something in their manual
22  that has to do with the quality of the products that you
23  sell.
24          A.  It says that, but I have never seen it.
25          Q.  Okay.  But I am not making it up.

00137
```
 1         A.  Or it never made any impact on me.
 2         Q.  All right.  Well, what these things are saying is
 3  that, at least in the operations manual, wouldn't you agree
 4  that they are talking about things that have something more
 5  to do with just picking a credit card and paying for the
 6  fuel?
 7              MR. FELL:  Calls for speculation, argumentative.
 8              MR. FETTNER:  Calls for speculation.
 9  BY MR. WEBB:
10         Q.  Okay.  And then Chapter 9, which you looked at
11  before on fuel spills, can you look at that?
12         A.  Yes.
13         Q.  It says, "Site maintenance, Section 1.  Site
14  maintenance."  I don't have the manual, but do you know what
15  that refers to as far as site maintenance?
16         A.  No.
17         Q.  Okay.  And then it says, "Annual Inspection
18  Report."
19              Do you see that, Section 5?
20         A.  Yes.
21         Q.  Okay.  And you have told me that, as far as you can
22  recall, that you are supposed to take a picture of the place;
23  right?
24         A.  Some form of picture.
25         Q.  They want to see how it looks; right?
```

```
U
00138
     1          A.  I don't know.
     2          Q.  And under that, it says, "Incident report
     3   procedures."
     4          Do you know when you are supposed to have an
     5   incident report?
     6          A.  No.
```

Page 59

**EXHIBIT 8**

1

2

3  MARK L. WEBB, ESQ. (BAR NO. 067959)
LAW OFFICES OF MARK L. WEBB

4  214 Grant Street, Suite 301
San Francisco, CA 94108

5  Telephone: (415) 621-4500
Facsimile: (415) 621-4173

6  Attorneys for Plaintiff
DONALD WALKER

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

                      SAN FRANCISCO
10

11  DONALD WALKER,                    Case No. C 07-2857 SC

12        Plaintiff,                  **DECLARATION OF GARY**
                                      **BUFFINGTON IN OPPOSITION**
13  v.                                **TO DEFENDANT'S MOTION**
                                      **FOR SUMMARY JUDGMENT**
14  PACIFIC PRIDE, a business entity, form

15  unknown, et al.                   Hearing Date:  November 2, 2007
                                      Hearing Time:  10:00 a.m.
16        Defendants.                 Courtroom:        1
                                      Trial date:    January 22, 2008
17

18

19  1.      I have been a safety engineer and safety consultant for over thirty years.  I have worked

20          for both the U.S. Government, State of California and in the private sector as a safety

21          systems analysis and have written numerous manuals and programs to reduce the chance

22          of injury at the work place.  In this regard, I have qualified as an expert witness in court

23          on numerous occasions and given expert opinions with respect to safety measures in place

24          at industrial work sites.  I have never failed to qualify as an expert in this area when

25          offered as one.

26          I am a current Certified Safety Professional (CSP) and Canadian Registered Safety

27          Professional (CRSP) by exam in the United States and Canada.  The certifications are

28

                                      1

equivalent to a Professional Engineer (PE) designation in safety. I am also a current Certified Safety Executive, Certified Safety Manager, and Certified Safety Specialist by the World Safety Organization (world wide). I am a current Certified Safety and Health Manager by the Institute for Safety and Health Management.

2.  I possess over thirty years experience in the safety discipline as a craft worker, supervisor, contractor, union representative, construction safety manager, design engineer, owner's representative, federal safety inspector, supervisory federal safety inspector, federal special investigator, federal supervisory special investigator, loss control manager, director of safety, assistant director of safety, expert in OSHA & MSHA regulation interpretations & applications, expert safety consultant, expert safety & security witness, and licensed private investigator. During my career I have participated in the completion of over $20 billion worth of surface and underground projects that required over 28 million employee hours of work.I am a graduate of the National Mine Safety and Health Academy in Beckley, West Virginia and subsequently I was designated a Designated Authorized Representative (DAR) by the United States Department of Labor. I am an authorized OSHA and MSHA Trainer by the respective organizations. I have completed thousands of hours of training in all facets of OSHA, CAL/OSHA, OR/OSHA, and MSHA regulations including all standards incorporated by reference. I have personally instructed thousands of hours of training in all facets of OSHA, CAL/OSHA, and MSHA regulations including all standards incorporated by reference including forklift training. I have conducted hundreds of safety audits and inspections throughout the United States in the application of all facets of OSHA, CAL/OSHA, OR/OSHA, and MSHA regulations

including all standards incorporated by reference.  During my career I have participated in

the completion of over $20 Billion worth of projects that required over 28 million

employee hours of work exposure.

3.    I am a current licensed Private Investigator, an accident investigator, a former federal

special investigator & supervisory special investigator, and a former deputy sheriff

criminal investigator.  I am a certified law enforcement officer in South Dakota and a

graduate of the South Dakota Division of Criminal Investigation Law Enforcement

Academy.  I have conducted several hundred investigations, including but not limited to

the following:  fatal & non-fatal accidents, criminal & civil safety regulations (state &

federal) violations.  I am actively involved in revising OSHA, CAL/OSHA, OR/OSHA,

and MSHA regulations.  I have served on the ANSI A-10 Standards Committee and a

number of the MSHA Standards Committees.  I am a past member of ASSE Council on

Practice & Standards Committee and ASSE House of Delegates.

4.    I possess an Associates Degree in Criminal Justice from the University of South Dakota.

I have a Bachelors Degree in Business Education from Black Hills State University.  I

completed the course work (need to complete the orals) for a Master of Science Degree in

Criminology from the University of South Dakota.  I completed approximately 54

semester hours of graduate work at the University of South Dakota, University of

Minnesota, Reid College, and UCLA.

5.    I am a professional member of the American Society of Safety Engineers (ASSE) which

is the oldest (1911) and largest (34,000 members) in the world.  I am a Charter Member

and past Administrator for the ASSE Mining Practice Specialty.  ASSE has only thirteen

3

Practice Specialties worldwide. I am a professional member of the Board of Certified Safety Professionals, Association for Canadian Registered Safety Professionals, Canadian Society of Safety Engineers, National Safety Council, World Safety Organization, Institute for Safety and Health Management, National Fire Protection Association, and Voluntary Protection Participants' Association.

6. The ASSE Mining Practice Specialty selected me as the 2002-2003 Safety Professional of the Year. The ASSE Construction Practice Specialty selected me as the 2000-2001 Safety Professional of the Year. In October 2000 I was one of seventy-five worldwide safety professionals invited to and participated in the first International Safety Forum in London, England. For the past fifteen years I have been included in Who's Who in the Safety Profession by the Center of Safety Education, National Security Institute. I have also been selected by Marquis Who's Who in the following areas: Science and Engineering, Finance and Industry, Emerging Leaders in America, East, West, America, and World. I received Meritorious Achievement Awards (1979 & 1980) and Monetary Award (1982) from the US Department of Labor. I was selected Police Officer of the Year (1975-1976) by the Sundown Optimist Club. My CV is attached hereto as Exhibit _____ to my Declaration.

7. I have read and considered many of the depositions in this case, including those of President of San Francisco Petroleum Robert Falche, OSHA investigator A. Lum and forklift operator, Steven Rios.

8. I have also reviewed the Pacific Pride Operations Manual, including Chapter Nine, which refers to fuel spills and also reviewed the franchise agreement dictating standards for

4

required operations of the fuel franchises of Pacific Pride. I have reviewed hundreds of employer's operation, operator's, maintenance, and repair manuals by various manufacturers for the equipment they design, build and distribute. Pacific Pride Operations Manual describes detailed, mandatory training concerning day-to-day operations and accounting practices, however, safety is not included on the same level of importance.

9.    In my opinion, as a long time safety expert and consultant who has written numerous safety manuals for various industries that use large equipment, the system in place on the date of the subject accident was totally inadequate. I prepared hundreds of Job Hazard Analysis (JHA) concerning the use, maintenance, and repair of a multitude of equipment. The purpose of the JHA is to break is to break each job down to individual tasks, assess the anticipated hazard exposure of each task, and to eliminate or guard against the said hazard. The JHA process includes input from the foreman, worker(s) performing the work, and the safety engineer. The JHA process is a recognized best practice for hazard assessment and is used by safety practitioners throughout the world. I conducted and/or observed hundreds of training sessions implementing various JHA including the use of forklifts. (See attached C.V.)

10.    With respect to cleanup of fuel spills, it is clear from the depositions and other materials that fuel spills are not uncommon at these franchise locations and occur during fuel deliveries. Because fuel spills occur with some regularity, it is my opinion that there should definitely be a written protocol that employees are made aware of so as to minimize exposure to accidents while fuel spills are being cleaned up. The Pacific Pride

Operations' Manual specifically requires that fuel spills be cleaned up as soon as possible, but gives little if any guidance as to how to do so safely, given the heavy equipment and vehicular traffic that is present. A written protocol should have been created dictating to each franchisee, its management and employees that specific safety precautions must be followed to minimize collisions during fuel spillage cleanups. No such protocol was written and this, in my opinion, falls completely below the standard of care for operating a fuel station and oil dispensary and federal regulations. I have written and implemented comprehensive hazardous material spill plans (that include various types of fuels) that met or exceeded strict Environmental Protection and Army Corps of Engineer requirements.

11.    An appropriate protocol that could and should have been put in place and that would, in my opinion, have prevented the subject accident would include use of orange cones or barricades to protect the employee cleaning up the spill who, while stooping down, would not have the same degree of visibility as someone standing up. Another device could have been a two-man look-out system, with the protocol dictating that one person observe the surrounding traffic while the other conducts the clean-up or that one person observe the surrounding traffic while walking alongside the forklift directing the forklift operator that the area in the direction of travel is safe and clear. Yet another possible simple and accepted safeguard would have been to require heavy equipment such as forklifts to have automatic beeping devices, regardless of the direction of travel, to warn clean-up and other personnel of their presence. None of these inexpensive common and well-

6

established safeguards were either put in place or used on the date of the accident, since

Pacific Pride's manual failed to so guide.

12.   Further, although the franchise agreement calls for regular inspections of the franchisees

to ensure compliance with OSHA, state law and accepted standards by the government

and the fuel industry, no inspections ever took place by Pacific Pride.  This in my mind

also fails to meet industry standards, state and federal regulations.

13.   It is also my professional opinion that the franchisor should require a safety program to

educate and control the inspection, training and auditing of employees and their

equipment so as to ensure that operators of forklifts e.g., are well-trained and know how

to conduct themselves without injuring co-employees or customers.  In this case, no such

program existed, and in fact, OSHA cited the franchise for failure to post forklift

operating instructions as well as failure to require the forklift operator to be properly

trained.  Also, the forklift contains a number of different mechanical defects that OSHA

cited, showing that no adequate inspection procedure was required either by Pacific Pride

or its franchise.

14.   The lack of accountability of both the franchisor Pacific Pride and its franchisee is

manifest in how this catastrophic accident was followed up afterwards.  A brief interview

of the forklift driver was the complete investigation of how this accident occurred, even

though the victim Plaintiff was rendered completely quadriplegic.  In my experience of

thirty years as an expert in the field of health and safety for the U.S. Government and in

the private sector, this type of safety and accident would typically trigger a

comprehensive, exhaustive investigation with written follow-up recommendations to

7

comprehensive, exhaustive investigation with written follow-up recommendations to prevent subsequent occurrences. In this case, no such investigation was done and no residual measures were even contemplated, let alone taken. I have never seen this egregious and disregard for forklift safety by both franchisor and franchisee after an easily preventable accident.

I declare under penalty of perjury under the laws of the State of California that all of the foregoing is true and correct except as to those matters which are stated upon information and belief, and as to those matters I believe them to be true.

Executed this 8th day of October, 2007 at _Santa Clara, CA_, California.

By: _____
      GARY BUFFINGTON

8

**EXHIBIT 9**









## The Commercial Fueling System

- Home
- Pacific Pride Advantage
- How it Works
- Locations
- How to Join
- Credit Application

### The Advantage

Today's competitive business climate demands that you operate your fleet at peak efficiency to stay ahead of the competitors. That means getting better control of your vehicle use and fuel consumption. Thanks to Pacific Pride's fast growing network of automated fueling stations, you can reach your goal of better fuel accountability from a single credit source.

- 24 hour access to over 1,000 fueling stations
- Open to Commercial vehicles only
- Top quality fuel and lubricants
- Diesel fuel at all sites
- Convenient site locations
- Truck and trailer access

### The Stations

Pacific Pride's Fueling stations are clean, modern, well lit and they're always open - 24 hours a day, seven days a week. This means there is no time lost searching for fuel on weekends or after hours. Your drivers have easy in-and-out access. There are seldom any lines because we serve only our commercial customers - our Frequent Fuelers.

Take Control of your Purchases

Every driver or vehicle in your fleet is issued a network Access Card encoded with billing and security numbers, product access and information specific to the individual customer. It's like an automated bank teller card. This helps you take control over the buying practices of your drivers. There are no lost receipts or unauthorized purchases to worry about.

Unlike major oil company bank credit cards, Pacific Pride cards can *only be used to purchase fuel or motor oil*. This increases purchasing control and reduces cash outflow to cover fueling expenses.
Thanks to Pacific Pride accountability and controls, you should realize significant long term savings. You can reduce petty cash disbursements and make cash receipts easier to manage. Even if you maintain your own on-site storage system, we can provide auxiliary products and expand your fueling reach.
We issue a detailed statement to your company that simplifies your bookkeeping and improves your control by providing the following facts:

- Vehicle and purchase details, including vehicle number
- Driver's identification
- Time of purchase and location
- The type of product
- Unit price and quantity purchased
- Automated miles per gallon calculation

Home | Advantage | Works | Join | Credit Application | Email



*Produced by the Internet Power Company, Seattle, WA*